******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

CONNECTICUT LIGHT AND POWER COMPANY *v.*
GARY PROCTOR
(SC 19531)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and
Robinson, Js.

*Argued September 19—officially released December 28, 2016\**

*Derek V. Oatis*, for the appellant (defendant).

*Alexander G. Snyder*, for the appellee (plaintiff).

*Opinion*

McDONALD, J. The sole issue in this certified appeal is whether the trial court properly found that the defendant, Gary Proctor, manifested assent to enter into an implied in fact contract with the plaintiff, Connecticut Light and Power Company, for the provision of electric services to a third party. We conclude that the Appellate Court properly determined that the trial court's finding that the parties had entered into an implied in fact contract under which the defendant would be responsible for payment for those services was not clearly erroneous. *Connecticut Light & Power Co.* v. *Proctor*, 158 Conn. App. 248, 256, 118 A.3d 702 (2015). Accordingly, we affirm the judgment of the Appellate Court.

The record reveals the following undisputed facts and procedural history. Prior to June, 2008, the defendant was employed by Avicula of America as general manager of its poultry business conducted on a farm leased by Avicula at 44 Upper Butcher Road in Ellington (farm). In June, 2008, Avicula sold the business to Robert Chan, Eastern Poultry Distributors, LLC, and Pedigree Chicks, LLC, who continued to operate the business at that site. The defendant was retained by Pedigree Chicks on a part-time basis to facilitate the transition. As part of that transition, the defendant was asked to set up an account for electric services for the new business. After the defendant contacted the plaintiff, it provided such service to the farm under an account in the defendant's name until August 20, 2009, at which time service was disconnected for nonpayment.

In December, 2011, the plaintiff brought the present action against the defendant for breach of an implied contract and unjust enrichment, alleging that it had provided electric services to the defendant at his request and that $14,620.51 in bills remained outstanding. The matter proceeded to a bench trial. The plaintiff proffered testimony from two of its representatives and documentary evidence. The defendant proffered his own testimony and no other evidence.

The plaintiff's primary witness, Jennifer Dupuis, who had experience monitoring delinquent accounts for the plaintiff, testified regarding the plaintiff's internal procedures for the creation and maintenance of its electric services accounts. She testified that whenever there are communications between the plaintiff and a prospective customer or a customer with an existing account, a notation is made in the plaintiff's internal computer system documenting the event. These notations, according to Dupuis, are made during or shortly after the event described therein. With that foundation, the plaintiff introduced internal records documenting its communications with the defendant through Dupuis. Although Dupuis had no personal knowledge of these

communications, she was able to explain the meaning of certain abbreviated terms or terms of art used by the plaintiff's representatives in the ordinary course of business to document these interactions.

The internal records reflect that the defendant first contacted the plaintiff in August, 2008, regarding electric services for the new business. The representative who received the "service inq[uiry]" noted that "[the defendant] has the business Ped[i]gree Chicks . . . ." The record further noted that Pedigree Chicks was not registered with the Connecticut Secretary of the State (state), which Dupuis explained was a requirement for establishing a commercial account. The defendant informed the representative that he did not want to put the account in his name. The defendant inquired about the balance due from the previous business but was unable to obtain that information because he could not provide Avicula's account number, and informed the representative that he would get in touch with the previous business to get more information.

The defendant telephoned the plaintiff again in November, 2008. According to the record of that call, the defendant informed the plaintiff that the "company took serv[ice]" as of June 20, 2008. According to Dupuis, when a prospective customer requests service, the representative always asks from what date the customer wants service to be established under the name of the newly created account. The record indicated that the representative cancelled the bill for the previous customer back to June 20, 2008, processed documentation to have an account set up, verified a mailing address, sent an application, and quoted a deposit of $2520.

Contemporaneous with the creation of that record, the plaintiff generated a "customer maintenance page" displaying the defendant's first name, middle initial, and last name, his home and cell phone numbers, and his Social Security number.[1] Dupuis testified that such information would be obtained only if the customer was "knowingly [accepting] personal responsibility for an account . . . ." The maintenance page indicated that the "legal entity" for which services were to be provided is a "proprietorship" for the defendant, with the defendant's name as the only entry in the field for "Responsible Parties." The page also denoted that the defendant was doing business as Pedigree Chicks with the farm's address listed as the service address. Pedigree Chicks was still not registered with the state at this time or any relevant time thereafter.

The defendant received at his home address a document entitled "Commercial & Industrial Application for Service" designated for a "PROPRIETORSHIP," which was accompanied by a letter dated November 26, 2008, the same date as the November telephone call. The defendant's name was on the first line of the application under the field for "Account Name." The application

listed the defendant's home address as the mailing address for the account and the farm's address as the service address. According to Dupuis, it is the plaintiff's regular practice to verify with each customer to what address he or she wants correspondence to be delivered and that this correspondence would not have been mailed to the defendant's home address unless he had requested it. There was no reference to Chan, Eastern Poultry, or Pedigree Chicks in the application, nor to any addresses associated with any one of them other than the farm.

The letter accompanying the application was addressed to the defendant, also noting his home address. The subject field stated "Application for Service—Deposit Required," listed an account number underneath, and the farm's address below the account number. Just as with the application, there was no reference to Chan, Eastern Poultry, or Pedigree Chicks in the letter. As to the content of the letter, it thanked the defendant for his "request" for electric service, indicated that a security deposit was required for the account, for which the defendant would be billed shortly, and asked that he complete and return the application.

The defendant neither returned the application nor paid a deposit. There is no record that any bill for a deposit was ever issued in connection with the subject account. Dupuis testified that the plaintiff may—and routinely does—accept oral applications from prospective customers or, at its election, may require a written application as a condition to service. The letter requested that the application be returned within seven days but did not state that receipt of a signed and completed application was a condition to service.

According to the plaintiff's records, the defendant telephoned the plaintiff again on January 13, 2009, "because he had not received a billing." Dupuis testified that, in order for a representative to discuss matters relating to an account that had been created, the account holder would have to verify his personal information contained in the plaintiff's internal database. The plaintiff's record of this call first reflects that "order instructions indicate that [the] customer has accepted responsibility for this site as of June 20, 2008."[2] It then indicates that the defendant told the representative that the account should not be in his name because he was "only the manager." The record noted that the representative suggested to the defendant that he should get the company to take over the service, but reminded him that it would have to be registered with the state. The record indicated that the defendant responded that he was immediately "driving to New Jersey (company headquarters) to discuss this property." The plaintiff's records denote a "mailing address change" on the same date as this telephone call with the defendant.[3]

According to the plaintiff's records, the next communication was initiated by one of the plaintiff's representatives to the defendant's cell phone in February, 2009, "to find out what the status is of his parent company taking over this service going back to June, 2008." The record indicates that the defendant believed that "they already had" done so and provided a meter number for the account on which they were purportedly paying the bills. The record noted that "they have new billing in 'his' name but have not [received] bills as [the plaintiff has] not processed this move." Dupuis explained that bills are not sent to the new customer until the plaintiff has processed a "move in order," which results in the closing of the current account and the substitution of the new account holder. The defendant identified Eastern Poultry of Brooklyn, New York as the "parent company" and "another company: Pedigree Chicks," with a New Jersey address. The representative noted that the defendant was going to contact the "parent company" one more time. There is no indication in the records that the defendant asked to terminate service under the account.[4]

The first bill for the account was not issued until May, 2009. That bill and all subsequent bills for the account were issued in the defendant's name, but mailed to the farm. Dupuis stated that the delay in issuing the first bill resulted from the defendant's purported request to retroactively assume responsibility for services dating back to June 20, 2008, which was a period for which the prior account holder had been billed. The plaintiff never sent the defendant written notification of his responsibility for paying for services, which was in violation of its policies.

In August, 2009, the plaintiff disconnected service on the account for nonpayment. The plaintiff thereafter referred the matter to a collections agency, which attempted to collect the debt from the defendant.

According to the plaintiff's records, in April, 2010, the defendant called the plaintiff regarding the final bill on the account. The record summarizing this conversation indicated that the defendant said that "he worked for a company that had birds on their farm and needed a name to 'borrow' to have electricity put on so he 'lent' them his name, [but] they never paid the bill . . . ."[5] Dupuis testified that, in her experience making notations in the plaintiff's internal system, words within quotation marks reflect the exact words used by the customer. The plaintiff's representative who received this telephone call, Michelle Messier, testified and confirmed that the quoted words would have been the specific words used by the speaker.

In a letter to the plaintiff's collection agency dated seven days after this call, the defendant disputed his responsibility for the debt, asserting that he neither

leased nor owned the farm, and merely had been employed by the company that leased the farm. He further stated: "I did not know of any issue until recently regarding this account. . . . I have no connection to this account except to have been asked by the company I worked for and . . . Chan to get the [electric] account set up for him as he is out of state. . . . When I found out that this bill had my name on it, I telephoned [the plaintiff] informing them again, as I had during our first conversation, that this account belongs to [Chan]," listing an address for him in New Jersey.

In his testimony, the defendant could not recall the substance of most of the telephone calls with the plaintiff's representatives but he denied setting up the account in his name and authorizing the plaintiff to charge him for services, retroactive or otherwise. He testified that he had served only as a consultant to Chan and Pedigree Chicks for approximately three and one-half months, on a part-time basis, to facilitate the takeover of the poultry business and to set up an electric service account with the plaintiff. He testified that he had been paid expenses only for his efforts. He admitted that opening such an account was beneficial to the continuation of his relationship with Chan.

With respect to the various communications with the plaintiff's representatives, the defendant recalled being told during the initial telephone call that he could not establish the account in the name of Pedigree Chicks because it was not registered with the state. The defendant confirmed that the plaintiff's customer maintenance page displayed his correct personal information. When asked on cross-examination if he had provided this information, the defendant replied, "I don't know honestly," "I could have," and "[i]t's possible," and conceded that there was no reason to believe the plaintiff had misappropriated the information from another source. He later testified that his "guess" was that Chan had used his name to open the account after the defendant brought him the application, although he could not say that for a fact. He acknowledged that he did not know whether Chan had his Social Security number but upon further prompting from the plaintiff's counsel testified that it was "very possible" that Chan had misappropriated his personal information. With regard to the application for service, the defendant testified that, upon receiving it: "I got in my car, and I took it directly to . . . Chan and said, you know, you've got to have this in your name, and you've got to pay the bill, or, you know, pay the application fee."

When asked on cross-examination about the April, 2009 telephone call with Messier, the defendant stated that he could not recall whether he had made certain statements reflected in the plaintiff's record of that call. The following exchange then occurred between the plaintiff's counsel and the defendant with regard to one

of those statements:

"Q. And that that company needed a name to, quote, borrow, quote, to have electricity put on, so he lent them his name. Do you see that part?

"A. I do.

"Q. Do you recall making that statement?

"A. No, I don't.

"Q. Is it your position that you did not make that statement or that you can't recall whether you did or not?

"A. I can't recall, but I can't imagine I would lend my name knowing that it was going to be billed for electrical service.

"Q. Well, do you think you lent your name without knowing that it would be your responsibility to pay the bill?

"A. I don't recall lending my name to this. I made it very clear to [Chan] that he needed to fill out the application and pay the bills."

The defendant initially testified on direct examination that he first had learned that the bills were in his name in April, 2010, after receiving notification from the collections agency. He admitted on cross-examination that he knew the account was in his name either after he received the application for service in November, 2008, or during the January, 2009 telephone call, which led to the following exchange between the plaintiff's counsel and the defendant:

"Q. . . . You testified that at this point in time, whenever that was, you knew the account had your name on it?

"A. Yes.

"Q. Did you understand that to mean that you were responsible for the account?

"A. No.

"Q. Did you understand that [the plaintiff] expected you to be responsible for the account?

"A. I don't know how to answer that. I think if it was—you know, I realized it was in my name, and that scared me. I wanted to get out of it. I went down and saw . . . Chan, and I said, you have got to take this over, and he said he would take care of it, and I never heard anything different from then on, so I assumed he was paying the bills.

"Q. Did you ever tell [the plaintiff] to terminate the account? . . .

"A. No, I didn't because I thought it was still ongoing. I thought he was paying for it. I had no idea it was in my name still."

On the basis of the aforementioned evidence, the trial court rendered judgment for the plaintiff on the first count of breach of an implied contract and for the defendant on the second count of unjust enrichment. In support of the judgment on the implied contract count, the court made the following findings: "The property was utilized as a business enterprise known as 'Pedigree Chicks,' which was not registered as a business with the [state]. Pedigree Chicks was a poultry operation and [the defendant] was a part-time employee who, at the time, worked about three hours a day twice a week.

"The owner of the business (which was just starting up in June, 2008) was a gentleman from New Jersey named 'Chan.' At that point in time [the defendant] (rather naively) called [the plaintiff] to arrange for electrical service for the poultry business. [Chan] was not present at the trial . . . .

"When [the defendant] finally realized [that] he was being billed he drove to New Jersey and met with [Chan], trying to persuade him to take responsibility for the [plaintiff's] bill. That effort was unsuccessful . . . .

"[The defendant] was of the opinion that he was doing [Chan] a favor by arranging for electrical service, but [the plaintiff] had [the defendant's] name, his Social Security number, and his home address on the application form. [The defendant] never asked to close off the account and [the plaintiff] complied with public utility regulations in its handling of the account.

"While the court is sympathetic to [the defendant's] plight the court finds there was an implied contract entered into by [the defendant] with the plaintiff. [The defendant] mistakenly relied on [Chan] to pay the electrical bills." The court awarded the plaintiff $14,620.51, covering the entire amount of unpaid bills.

The defendant appealed from the trial court's judgment, and the Appellate Court affirmed the judgment. *Connecticut Light & Power Co.* v. *Proctor*, supra, 158 Conn. App. 256. The Appellate Court observed that, although the trial court did not state so expressly, it had found a contract implied in fact, not implied in law. Id.; see also id., 249 n.1. The Appellate Court held that the defendant had failed to establish that the trial court's finding that an implied in fact contract existed was clearly erroneous under either prong of the clear error standard. Id., 256. We thereafter granted the defendant's petition for certification to appeal from that judgment. *Connecticut Light & Power Co.* v. *Proctor*, 319 Conn. 905, 122 A.3d 639 (2015).

The defendant asserts that the trial court's finding that an implied in fact contract existed was clearly erroneous because (a) it was contrary to the evidence showing that he had made explicit his intention not to have his name on the account, and (b) the plaintiff

deviated from its own procedures by rendering service prior to its receipt of the application for service or a security deposit and by failing to give written notification that he was being billed for such service. He also asserts that the trial court's subordinate findings of fact are legally insufficient to establish the ultimate issue of fact of the existence of an implied in fact contract. We disagree.

It is well settled that the existence of an implied in fact contract is a question of fact for the trier. See *Simmons* v. *Simmons*, 244 Conn. 158, 187, 708 A.2d 949 (1998); see also *Rahmati* v. *Mehri*, 188 Conn. 583, 587, 452 A.2d 638 (1982) ("[w]hether and on what terms a contractual commitment has been undertaken are ultimately questions of fact"). Accordingly, our review is limited to a determination of whether the decision of the trial court is clearly erroneous. "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Because it is the trial court's function to weigh the evidence and determine credibility, we give great deference to its findings. . . . In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached. . . . Instead, we make every reasonable presumption . . . in favor of the trial court's ruling." (Internal quotation marks omitted.) *Stevenson Lumber Co.-Suffield, Inc.* v. *Chase Associates, Inc.*, 284 Conn. 205, 216–17, 932 A.2d 401 (2007); accord *Bender* v. *Bender*, 292 Conn. 696, 728–29, 975 A.2d 636 (2009).

With respect to implied in fact contracts, we have recognized that "[w]hether [a] contract is styled express or implied involves no difference in legal effect, but lies merely in the mode of manifesting assent." (Internal quotation marks omitted.) *Boland* v. *Catalano*, 202 Conn. 333, 337, 521 A.2d 142 (1987). "A true implied [in fact] contract can only exist [however] where there is no express one. It is one which is inferred from the conduct of the parties though not expressed in words." (Internal quotation marks omitted.) *Janusauskas* v. *Fichman*, 264 Conn. 796, 804, 826 A.2d 1066 (2003); see also *Hydro-Hercules Corp.* v. *Gary Excavating, Inc.*, 166 Conn. 647, 652, 353 A.2d 714 (1974) ("[t]he intention of the parties manifested by their words and acts is essential to determine whether a contract was entered into and what its terms were" [internal quotation marks omitted]).

"A contract implied in fact, like an express contract, depends on actual agreement." (Internal quotation marks omitted.) *Coehlo* v. *Posi-Seal International, Inc.*, 208 Conn. 106, 111, 544 A.2d 170 (1988); see also *Hoffman* v. *Fidelity & Casualty Co. of New York*, 125 Conn.

440, 443–44, 6 A.2d 357 (1939) (if parties' "minds have never met, no contract has been entered into by them"). However, "[i]t is not fatal to a finding of an implied contract that there were no express manifestations of mutual assent if the parties, by their conduct, recognized the existence of contractual obligations." (Internal quotation marks omitted.) *Janusauskas* v. *Fichman*, supra, 264 Conn. 805; see also *Therrien* v. *Safeguard Mfg. Co.*, 180 Conn. 91, 94–95, 429 A.2d 808 (1980) (plaintiff has burden of proving that defendant "agreed, either by words or action or conduct, to undertake [some] form of actual contract commitment"). Thus, "conduct of one party, from which the other may reasonably draw the inference of a promise, is effective in law as a promise." 1 R. Lord, Williston on Contracts (4th Ed. 2007) § 4:2, pp. 344–46. "As long as the conduct of [the] party is volitional and that party knows or *reasonably ought to know that the other party might reasonably infer from the conduct an assent to contract*, such conduct will amount to a manifestation of assent." (Emphasis added.) Id., pp. 352–53; accord 1 Restatement (Second), Contracts § 19 (2) (1981).

In the traditional terms of offer and acceptance, when a "request is made under such circumstances that a reasonable person would infer an intent to pay for them . . . the request amounts to an offer, and a contract is created by the performance of the work." (Internal quotation marks omitted.) *Butler* v. *Solomon*, 127 Conn. 613, 615, 18 A.2d 685 (1941). We have recognized, consistent with that principle, that "[a]n implied [in fact] contract would arise if the plaintiff rendered services, at the request of the defendant, under an expectation that they were to be paid for and if the defendant either intended to pay for them or the services were rendered under such circumstances that the defendant knew, or, as a reasonable person, should have known, that the plaintiff did expect payment."[6] Id.; see also *Charter Oak Estates, Inc.* v. *Kearney*, 160 Conn. 522, 531–32, 280 A.2d 885 (1971); *Casey* v. *McFarlane Bros. Co.*, 83 Conn. 442, 443, 76 A. 515 (1910); *Weinhouse* v. *Cronin*, 68 Conn. 250, 253, 36 A. 45 (1896). It is of particular relevance in this case that "[t]he question . . . is not whether the defendant in fact expected to pay for the services but whether they were rendered under such circumstances that the defendant either knew, or as a reasonable man, should have known, that the plaintiff expected compensation." *Butler* v. *Solomon*, supra, 616; accord *Casey* v. *McFarlane Bros. Co.*, supra, 443; cf. *Cecio Bros., Inc.* v. *Greenwich*, 156 Conn. 561, 568, 244 A.2d 404 (1968).

With these principles in mind, we turn to the Appellate Court's conclusion that the trial court's finding of an implied in fact contract was not clearly erroneous. We recognize, as an initial matter, that the trial court's subordinate factual findings are not as clear or as detailed as might be expected for such a fact intensive

determination.[7] Nevertheless, certain essential subordinate findings are necessarily implicit in those expressly made. For example, the logical implication of the trial court's finding that the defendant "rather naively" telephoned the plaintiff to arrange electric service for the farm is that the defendant set up the account in his own name. Moreover, the finding that the defendant "mistakenly relied" on Chan to pay the bills necessarily implies that the defendant knew or should have known he would be held responsible for paying the electric bills if Chan did not. It is also apparent that the trial court credited the plaintiff's records as an accurate reflection of the communications with the defendant. Indeed, the trial court's findings indicate that, except for those limited instances in which the defendant's testimony directly contradicted those records, the court credited his testimony.[8] Finally and significantly, this is a case in which the defendant did not directly dispute most of the plaintiff's evidence. When asked whether he had made certain statements or undertaken certain actions reflected in the plaintiff's evidence, the defendant did not unequivocally deny having said or done such things. Instead, he most often stated that he could not recall having done so and effectively conveyed that it was possible but not likely that he had done so. Thus, we are not compelled to remand the present case to the trial court for an articulation of its decision. See, e.g., *State* v. *Lafferty*, 191 Conn. 73, 76–77, 463 A.2d 238 (1983) (articulation necessary where trial court failed to make requisite finding of fact); *Kaplan* v. *Kaplan*, 185 Conn. 42, 46, 440 A.2d 252 (1981) (articulation necessary where trial court denied motion without providing any oral or written basis for decision).

Before commencing our analysis of whether the finding of an implied in fact contract was clearly erroneous, we observe that the defendant has not advanced a claim that, even if such a contract were found to exist, his liability thereunder is more limited than that found by the trial court. Therefore, our review is limited to the question of whether an implied in fact contract for electric service ever existed. See footnote 6 of this opinion.

The record supports the trial court's finding that the defendant requested that the plaintiff establish an account for the provision of electric service to the farm. The defendant admitted that Chan and his former employer had asked him to create an account with the plaintiff. He also conceded that, consistent with the plaintiff's internal record, he had made the initial call in August, 2008, for that purpose. The evidence supports a conclusion that the defendant telephoned again on November 26, 2008, and that, as a result of the discussion that ensued, the plaintiff took steps to cancel the bill for the previous account holder and establish a new account for the provision of services at the farm. The plaintiff mailed a letter to the defendant acknowledging

his request for service at the farm's address. After receiving the letter and the application for service, the defendant did not contact the plaintiff to inform it either that an account should not have been created or that service should not be provided to the farm.

The record also supports the trial court's implicit finding that the defendant knew, or reasonably should have known, that the account was opened in his name. The defendant admitted at trial that, as alluded to in the plaintiff's record of the August, 2008 telephone call, he was informed that the plaintiff would not establish an account in the name of Pedigree Chicks unless it was registered with the state. There is no evidence that the defendant had any reason to believe that Pedigree Chicks had registered at some point thereafter, and Dupuis testified that the company had never been registered as of the time of trial. With knowledge of this impediment, the defendant initiated a second attempt to open an account in November, 2008.

The evidence firmly supports the conclusion that, in the course of this communication, the defendant provided the plaintiff with his personal information, including his Social Security number, which the plaintiff would not have elicited unless the defendant had accepted personal responsibility for the account.[9] There is no evidence that anyone other than the defendant communicated with the plaintiff with regard to establishing this account or even that anyone else had this information to give to the plaintiff. There is no evidence that similar identifying information was elicited from, or provided by, the defendant for any other person or entity. As previously indicated, when the defendant received the letter and the application for service in November, 2008, unambiguously showing the account in his name, he did not contact the plaintiff to inform it that there had been an error. Significantly, the plaintiff's records indicate that the defendant admitted in his call with Messier that Pedigree Chicks needed a name to " 'borrow' " so he " 'lent' " his. The defendant did not dispute having made this statement; rather, he thought it unlikely that he would have made it.

There is no dispute that the defendant knew that the plaintiff was providing electric service to the farm during the relevant period. The defendant admitted that he had seen the electricity on during the time that he worked for Chan and Pedigree Chicks. The defendant acknowledged that it was his job to establish an account to continue electric service to facilitate the transition after June, 2008. The unpaid bills admitted into evidence establish that the plaintiff provided service to the farm from June, 2008, until August, 2009. The record of the November, 2008 telephone call reflects that the defendant knew electric bills had continued to accrue after Pedigree Chicks took over the farm in June, 2008. The January, 2009 call initiated by the defendant because

he had not received a billing necessarily implies that he knew that services were continuing to be provided. The record of the February, 2009 call also shows that the defendant believed that the farm was still receiving service under a specific meter tied to the account.

Finally, the record supports a finding that the parties reached an agreement under which the defendant would be billed for services provided to the account in his name until such time as Chan, Pedigree Chicks, or Eastern Poultry properly changed the account over to one of their names. Dupuis testified that the personal information elicited by the plaintiff in the November, 2008 telephone call would not have been obtained unless the prospective customer understood that he would be responsible for obligations on the account. The letter and the application for service sent in November, 2008, to the defendant put the defendant on notice that he alone was responsible for payment on the account by designating him as the sole account holder and the sole "Responsible Part[y]." His home address was also designated as the account's mailing address. The defendant's telephone numbers were the sole contact numbers elicited at the time the account was opened. The defendant's call in January, 2009, to the plaintiff asking why he had not received a bill necessarily implies that he was expecting one. Finally, it is even questionable whether the defendant subjectively believed that opening the account in his name would not subject him to liability on the account. The defendant admitted that he was "scared" when he found out the account was in his name and that he "wanted to get out of it," reactions that belie such a subjective understanding.

The defendant's failure to return a completed application for service or to pay the security deposit does not compel a conclusion that the trial court's finding of an implied in fact contract was clearly erroneous. To the contrary, the January, 2009 telephone call initiated by the defendant to inquire why he had not received a bill compels the conclusion that he knew that services were being rendered and that bills were accruing on the account, notwithstanding his failure to submit the application or pay the security deposit. Moreover, although the letter stated that a security deposit was required for the account and requested return of the application, the letter did not state that such actions were a condition precedent to service. Indeed, the security deposit was not due until billed, and no bill ever was issued. We observe that, if the defendant had returned a signed and completed application for service, that fact would establish an express contract, thus eliminating the possibility of a contract implied in fact. Cf. *Janusauskas* v. *Fichman*, supra, 264 Conn. 804 ("[a] true implied [in fact] contract can only exist . . . where there is no express one" [internal quotation marks omitted]).

We also are not persuaded that the plaintiff's violation of its own policy requiring written notification to a customer of his obligation to pay for services compels a different conclusion. The defendant did not assert a special defense of estoppel. Regardless, there is no evidence that the defendant knew of any such policy and, therefore, relied upon it. Moreover, the defendant's January, 2009 telephone call asking why he had not received bills contradicts a lack of notice in this respect.

The mere fact that the bills were sent to the farm address rather than to the defendant's home address is not dispositive on the existence of an implied in fact contract. As indicated previously, the defendant knew that the plaintiff was providing services in accordance with his request. The defendant has asserted no equitable defenses relating to the late notice of the amount of the bills. Moreover, the January and February, 2009 telephone calls indicate that the defendant had actual notice that bills were accruing under the account. It is also unclear who initiated the "mailing address change" on the defendant's account on the same date as the January, 2009 telephone call. The confluence of this change and the defendant's inquiry about billing, in the context of Dupuis' testimony that correspondence would be sent where the customer directed it, would logically support one conclusion—that the defendant's statements indicated that all correspondence should be sent to the farm, which was the service address.

Finally, to the extent the defendant's argument may be construed as asserting that there was no meeting of the minds because, subjectively, he never intended to be responsible for the account, that argument mischaracterizes the phrase meeting of the minds. We have recognized, consistent with the objective theory of contracts, that "[t]he making of a contract does not depend upon the secret intention of a party but upon the intention manifested by his words or acts, and on these the other party has a right to proceed." *Nutmeg State Machinery Corp.* v. *Shuford*, 129 Conn. 659, 661, 30 A.2d 911 (1943); see also *Hess* v. *Dumouchel Paper Co.*, 154 Conn. 343, 348, 225 A.2d 797 (1966). Although "[t]he phrase 'meeting of the minds' is . . . commonly used by the courts to determine whether there has been mutual assent," it has been described as a "misnomer because the minds of the parties to a contract need not, in fact, subjectively meet; rather . . . objective assent is all that is required." 1 R. Lord, supra, § 3:2, p. 259 n.1; see also *Address* v. *Millstone*, 208 Md. App. 62, 82, 56 A.3d 323 (2012), cert. denied, 430 Md. 646, 62 A.3d 731 (2013). The inquiry, therefore, is whether a reasonable person in the defendant's position would have understood that by opening an account in his name with his personal information, he would be responsible for paying the electric bills if a third party neither paid the bills nor took over the account; it is not whether

the defendant subjectively and/or unreasonably believed that he would never be held responsible for the bills because he intended for a third party to assume responsibility for the account.

We acknowledge that an obvious question exists as to why a part-time, temporary employee of a poultry business would have agreed to place himself in a position where he could be held liable for the farm's electric bills, even if, as the trial court found, the defendant naively believed that Chan would pay the bills. That question may have been answered if the defendant had called Chan as a witness or impleaded Chan, Pedigree Chicks, or Eastern Poultry as a third-party defendant. For reasons that are not apparent from the record, he declined to do so. Nonetheless, the trial court was not bound to determine the defendant's motivation for entering into the agreement with the plaintiff.

Our function is not to substitute our own judgment for that of the trier of fact; instead, we must make every reasonable presumption in favor of the trial court's ruling. See *Stevenson Lumber Co.-Suffield, Inc.* v. *Chase Associates, Inc.*, supra, 284 Conn. 216–17. In light of the record before that court, the Appellate Court properly concluded that the trial court's finding that the defendant " 'rather naively' " entered into an implied in fact contract with the plaintiff; *Connecticut Light & Power Co.* v. *Proctor*, supra, 158 Conn. App. 252; garners sufficient support in the evidence and does not give rise to a firm and definite conviction that a mistake has been committed.

The judgment of the Appellate Court is affirmed.

In this opinion PALMER, ZARELLA, ESPINOSA and ROBINSON, Js., concurred.

* December 28, 2016, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] Although the date of this document's creation is not reflected on the printout, Dupuis testified that it would be "created at or near the time of the event," i.e., the date the account was created. That the account was created on November 26, 2008, the day of the telephone call, is plainly reflected in the record of the call indicating that the representative had processed documentation to set up an account and the plaintiff's letter to the defendant dated November 26, 2008, reflecting that an account number had been assigned to the defendant.

[2] No such "order instructions" were proffered at trial, or thereafter made a part of the record.

[3] Dupuis was never shown the mailing address change entry in this exhibit and asked to explain it. When asked well after this exhibit was discussed as to other entries therein why bills had been sent to the farm address and not to the defendant's home address, Dupuis replied that she did not know.

[4] This record also notes that the defendant "understands that we will close order with it in his name." Dupuis explained that closing an order, in the plaintiff's parlance, is synonymous with activating an account. Because it is unclear how this matter was conveyed to the defendant and it is not dispositive in our review of the trial court's ruling, we have disregarded this statement.

[5] Although the record of this conversation identified the caller as "George," not Gary, the only reasonable conclusion that can be drawn from the evidence, which the trial court implicitly reached, is that this was merely a scrivener's error. Dupuis' testimony established that the plaintiff's representatives could not discuss an account with the account holder until he had verified his personal information in the plaintiff's system, and could not

discuss the account with a third party unless the account holder had authorized the plaintiff to do so. In addition, the summary of the call reflects facts consistent with the defendant's unique circumstances. Finally, in a letter that the defendant wrote to the plaintiff's collections agency dated seven days after this telephone call, the defendant referred to a recent call that he had made to the plaintiff after learning that the bills were in his name, and the fact that he had helped facilitate Chan's takeover of "the flock of chickens housed on this farm . . . ."

[6] We have most recently described the test for demonstrating the existence of an implied in fact contract under circumstances wherein the defendant's assent to the contract was manifested in the acceptance of performance. See, e.g., *Janusauskas* v. *Fichman*, supra, 264 Conn. 804–805 (implied in fact contract "arises where a plaintiff, without being requested to do so, renders services under circumstances indicating that he expects to be paid therefor, and the defendant, knowing such circumstances, avails himself of the benefit of those services"); see also *Vertex, Inc.* v. *Waterbury*, 278 Conn. 557, 574, 898 A.2d 178 (2006). Our earlier case law properly recognized that the defendant's assent to the implied in fact contract could be inferred either when the defendant requests services or when the defendant accepts services with knowledge that the plaintiff expected to be paid for them. See, e.g., *Summa* v. *Dereskiawicz*, 82 Conn. 547, 550–51, 74 A. 906 (1909); *Weinhouse* v. *Cronin*, 68 Conn. 250, 253, 36 A. 45 (1896).

[7] The defendant filed a motion for articulation, which the trial court denied. He did not seek review of that denial. Although the trial court should have made a finding as to when the contract was created, as the discussion that follows demonstrates, the evidence establishes that the defendant made an offer in the November, 2008 telephone call, and the plaintiff accepted that offer by opening an account at that time and thereafter providing services in accordance with the defendant's request. Given, however, that the defendant does not independently challenge any specific period of time as not falling within the scope of the implied in fact contract, the precise date of offer and acceptance is not determinative.

[8] Thus, to the extent that the defendant claimed that he had informed the plaintiff's representatives in every conversation that he did not want the account in his name, the evidence is to the contrary. The fact that the plaintiff's records do reflect such a comment in the initial August, 2008 call and the January, 2009 call suggests that the plaintiff's representatives understood that such a comment was of significant enough importance that they should memorialize it when stated. In addition, the personal information elicited from the defendant in the second call in November, 2008, is wholly inconsistent with him having made such a statement at that time.

[9] As previously noted, the defendant acknowledged that it was possible that he had given this information to the plaintiff. Although he later speculated that Chan *could have* given this information to the plaintiff, even though the defendant had no knowledge whether Chan had all of this information, the trial court properly would not base a finding on such speculation. See *State* v. *Sunrise Herbal Remedies, Inc.*, 296 Conn. 556, 572, 2 A.3d 843 (2010) ("[a] person who has no personal knowledge about the subject matter of his or her testimony, i.e., the person is guessing or speculating, is an incompetent witness as to that matter" [internal quotation marks omitted]).