JOHNSON v. FEDERAL UNION SURETY CO.

1. CONTRACTS—ACCEPTANCE—REJECTION—COMPROMISE AND SETTLE-MENT.

Where an offer of settlement was made by defendant, with the understanding that plaintiffs' assignor should have time to consider the offer and report later, an attempt by the latter to modify or change the offer did not have the effect of rejecting it.

2. SAME—REVOCATION—ACCEPTANCE.

Where an offer has not been revoked, a party may accept it, although he previously asked the proposer to modify it.

3. SAME—COMPROMISE AND SETTLEMENT—ACCEPTANCE—REASON-ABLE TIME—DIRECTED VERDICT.

Where it is conceded that the offer was made by one having authority to make it, and it also clearly appears that the proposer was to be notified later as to acceptance, defendant's claim that the offer should have been accepted or rejected when made cannot be sustained, and the question as to whether acceptance was made within a reasonable time should have been submitted to the jury, under proper instructions.

Error to Ingham; Wiest, J. Submitted June 10, 1915. (Docket No. 41.) Decided July 23, 1915.

Assumpsit by P. Albin Johnson and Leo L. Wood, copartners as Johnson & Wood, assignees of the Title Guaranty & Surety Company, against the Federal Union Surety Company, a foreign corporation. From a judgment for defendant on a verdict directed by the court, plaintiffs bring error. Reversed.

*Goodenough & Long*, for appellants.

*Moore & Moore*, for appellee.

STONE, J. Plaintiffs and appellants are assignees of a claim of the Title Guaranty & Surety Company against the defendant, based upon a contract which plaintiffs claim defendant made with said first-named company to contribute $2,500 to a settlement which the Title Guaranty & Surety Company made with the State of Michigan in discharge of official bonds signed by plaintiffs' assignor, the defendant, and other surety companies in behalf of Frank P. Glazier, as State treasurer.

When Glazier entered upon his first term as State treasurer in January, 1905, he executed an official bond to the State in the penal sum of $150,000, and obtained as his surety the Fidelity & Deposit Company of Baltimore, Md. At the beginning of the second year of his first term the Fidelity & Deposit Company, becoming dissatisfied, persuaded him to give a new bond, and he accordingly executed a second bond covering the same term, signed by the Empire State Surety Company, Federal Union Surety Company, Bankers' Surety Company, and Ætna Indemnity Company, as sureties. By this bond the two first-named companies became liable for $50,000 each, and the two last named for $25,000 each.

Glazier was re-elected State treasurer in 1906, and began his second term in January, 1907. Upon entering office he gave an official bond in the sum of $150,-

000 for the first year of his second term, with the Title Guaranty & Surety Company as surety. In the latter part of the year 1907 the Chelsea Savings Bank, of which Glazier was a principal stockholder and director, failed, owing the State about $685,000, which Glazier, as State treasurer, had deposited in the bank during his terms of office. A receiver was appointed for the bank and its affairs liquidated. Dividends were paid to the State by the receiver, and the State authorities collected from various sureties upon depository bonds given by the bank sufficient to reduce the principal indebtedness of the bank to the State to the sum of $84,758.07. This sum was ascertained in January, 1912.

Pending the liquidation of the affairs of the bank and the collections upon depository bonds, the State brought suit in the Ingham circuit against the Title Guaranty & Surety Company, upon its official bond, alleging that the deposit by Glazier in the Chelsea Savings Bank was a violation of his trust, and that the bond was forfeited. This suit was stayed by a chancery suit brought by the Title Guaranty & Surety Company against the State, the receiver of the Chelsea Savings Bank, and the sureties upon the bonds given during the first term of office. The bill in that suit alleged that part of Glazier's default occurred during his first term, for which the Title Guaranty & Surety Company was not liable.

An accounting was sought between the various surety companies to determine the proportion of the State's claim which should be borne by each. This bill was finally dismissed in this court in December, 1911. See *Title Guaranty, etc., Co. v. Indemnity Co.,* 167 Mich. 535 (133 N. W. 515). The outcome of the chancery case left the suit of the State against the Title Guaranty & Surety Company where it had been before the bill was filed. Preparation was being made

for the trial of this case, when it was suggested by the vice president of the defendant in that suit and by its attorneys that a conference be held between representatives of the various surety companies upon Glazier's bonds, and the attorney general, to adjust, if possible, the amounts, if anything, which the companies upon the first term bonds should pay in satisfaction of the State's claim.

Joseph A. Sinn, vice president of the Title Guaranty & Surety Company, notified the other surety companies interested, including the defendant, of a proposed meeting in New York. The first letter to the defendant was as follows:

"THE TITLE GUARANTY & SURETY COMPANY.
"SCRANTON, PENNSYLVANIA, March 6, 1912.
"FEDERAL UNION SURETY COMPANY,
"Indianapolis, Indiana.
"*Gentlemen:*
"In re: Frank P. Glazier.
"Mr. Bell, our comptroller, and I were in Detroit a few days ago, and had a five minutes talk with Mr. Kuhn, the attorney general. It was not very satisfactory.

"However, since then our attorney, Mr. Luman W. Goodenough, of Detroit, has had a conference with Mr. Kuhn and Mr. Kuhn has made the suggestion that we arrange to have representatives of all the companies interested meet him in New York to talk over the situation. Mr. Kuhn has an appointment for the 22d of March, but we are informed that he will be free any other day. Would your company be willing to attend such a conference?

"I have written to the other companies interested, and if responses are favorable, I will ask the attorney general to fix a time for meeting, or I will suggest a time to him, if that is the consensus of opinion of the parties interested. Will you kindly let me hear from you.                           Very truly yours,
                                      "JOS. A. SINN,
                                         "Vice President."

Under date of March 9, 1912, C. M. Abbott, vice

president of defendant, answered this letter, stating:

"I do not know to what you refer when you ask for a conference regarding this matter. If you will explain to me in detail just what you are driving at, I shall be very glad to advise you our attitude."

To this Mr. Sinn replied as follows, under date of March 11, 1912:

"MR. C. M. ABBOTT,
    "Vice President Federal Union Surety Company,
        "Indianapolis, Ind.
    *"Dear Sir:* In re: Frank P. Glazier.
    "I assume that you are perfectly familiar with the Glazier case, and with the fact that your company is on the bond of Mr. Glazier for the first term of his office.
    "Mr. Kuhn, the present attorney general of the State of Michigan, stated to our attorney in Detroit, that he was going to take some action in this matter with the companies on the bond for the first term, and before doing so, it was he, Mr. Kuhn, that suggested that he meet the representatives of the companies interested in New York some time during this month.
    "I have heard from two of the companies, the Fidelity & Deposit Company and the Empire State Surety Company, stating that their representatives would attend a conference on a day fixed. I would like to know what you will do.
    "Will you kindly let me hear from you by return mail.             Yours very truly,
                        "JOS. A. SINN,
                        "Vice President."

Accordingly, a meeting was arranged at the Waldorf Astoria Hotel, New York, for April 12, 1912. A conference was held at the time and place arranged and was attended by the following persons: the attorney general of Michigan; Joseph A. Sinn, vice president; Grant L. Bell, auditor; and Mr. Goodenough, counsel for the Title Guaranty & Surety Company; Joseph T. Magee, representing the Empire State Surety Company; Charles W. Miller, representing the Fidelity &

Deposit Company; M. A. Craig, representing the Bankers' Surety Company; and C. M. Abbott, vice president of the defendant, representing that company.

After a statement by Mr. Goodenough and the attorney general, they, with Mr. Sinn and Mr. Bell, withdrew, and a separate conference was held by the representatives of the surety companies upon the first-term bonds. According to the plaintiffs' claim and testimony, there was at this conference a discussion of the question of liability to the State, and the opinion was expressed quite generally that the representatives did not believe the companies upon the first-term bonds were liable to the State, but that there was doubt upon the question, and that, rather than have any litigation, the companies upon the first-term bonds would contribute certain amounts to a settlement with the State. The sum suggested was figured upon the basis of a contribution of $15,000. The Fidelity & Deposit Company was to contribute $7,500; the Empire State Surety Company, $2,500; the Federal Union Surety Company, $2,500; and the Bankers' Surety Company, $1,250. The Ætna Indemnity Company, which was a surety upon the second bond of the first term, was then insolvent, and it was suggested that the Title Guaranty & Surety Company assume the share which that company would have been expected to contribute to a settlement upon the basis of $15,000.

Plaintiffs' witnesses testified that the amounts named were unconditionally offered to the representative of the Title Guaranty & Surety Company, with the exception of the amount named by the Bankers' Surety Company, whose representative stated that he did not have authority to make the offer, but that he would recommend it to his company.

Upon calling the representatives of the Title Guaranty & Surety Company back to the room, Mr. Miller, acting as spokesman for the representatives of the

other companies, stated that the several companies would contribute upon the basis of $15,000, and named the amounts above given. Mr. Abbott was present when this statement was made, and it was the claim of the plaintiffs that he assented to it. Mr. Sinn replied to the proposition that he was disappointed that a larger amount was not offered, but said that he would confer with the home office of his company and advise the representatives of the other surety companies later. Thereupon Mr. Sinn made trips to the home offices of the other surety companies, and succeeded in obtaining a larger amount than that which had been previously promised from the Fidelity & Deposit Company and from the Bankers' Surety Company.

About May 24, 1912, Mr. Sinn visited the home office of the defendant, at Indianapolis, and saw Mr. Abbott. In their conversation, Mr. Sinn testified that he stated to Mr. Abbott that he hoped that the company would be willing to make a contribution of $3,333.33, which would be its proportion based on a total of $20,000; that Mr. Abbott stated that he would confer with the president of his company, who was not in Indianapolis at that time; and that he would let Mr. Sinn know that day or the next, as the president was expected home. During the conversation Mr. Sinn referred to the $2,500, which it is claimed Mr. Abbott agreed to contribute at the conference. The next day, while Mr. Sinn was in Chicago, he received a telegram from Mr. Abbott in the following words:

"Am unable to give any assurance whatever as to what this company will do in matter discussed yesterday."

On May 27, 1912, Mr. Sinn replied by letter, acknowledging receipt of the telegram, but saying:

"I do not quite understand it, but perhaps your president did not return on Saturday. May I ask you

to write me at Scranton as soon as you are able to give me a reply?"

Later, and on June 6, 1912, Mr. Sinn again wrote Mr. Abbott as follows:

*"Dear Sir:*

"In re: Frank P. Glazier.

"May I have a definite reply from you now, on the above subject? The matter must be disposed of in the near future, and I await hearing from you."

On June 8, 1912, Mr. Abbott replied to that letter as follows:

"Referring to your letter of the 6th relative to the Glazier matter, I have referred it to Mr. Wofford at Dallas. I am writing again today asking that he advise me regarding it. As soon as I hear from him I will communicate with you."

To this letter Mr. Sinn, on June 10th, replied:

*"Dear Mr. Abbott:*

"In re: Frank P. Glazier.

"I have received your favor of the 8th instant, for which I thank you. I do not want to appear to be unduly pressing in the matter, but the question of settlement is immediately at hand, and I would like to have your reply as soon as possible. If you can do anything to hurry the matter I will personally appreciate it."

On July 3, 1912, Mr. Sinn wrote to Abbott as follows:

*"Dear Sir:*

"In re: Frank P. Glazier.

"I had hoped to hear from you before this in this matter. We cannot settle the case for less than the full amount of the claim (not including interest), $84,-763.07.

"We are still expecting that you will agree to pay us $3,333.33, which would be on the basis of a contribution by the companies on the first term bond of $20,000, we assuming the share of the Ætna Indemnity Company. I would appreciate very much receiving your check for this amount, or if your company is not will-

ing to go along on this, we would thank you to send us the amount pledged by you of $2,500.

"I think you understand that the Fidelity & Deposit Company and the Bankers' Surety Company have agreed to contribute on the new basis."

Abbott replied to this on July 5th, as follows:

"*Dear Sir:*

"I have your letter of July 3d relative to the Glazier matter. I have referred it to President Wofford at Dallas and as soon as I hear from him will communicate with you further."

On July 29, 1912, Mr. Sinn wrote Mr. Abbott the following letter:

"*Dear Sir:*

"In re: Frank P. Glazier.

"May we not have definite answer without further delay in this matter? If you would prefer that we take up the matter directly with Mr. Wofford, we will do so.

"The other companies have come through on the proposition, and you, doubtless, will live up to the amount you pledged. We have settled the claim for the full amount, $84,763.07, without interest, and have taken a release from the State of Michigan."

On August 6, 1912, Mr. Abbott, vice president of defendant company, wrote Mr. Sinn the following letter:

"Federal Union Surety Company,
    "C. M. Abbott, Vice President.
        "Indianapolis, Ind., August 6, 1912.
"Mr. Joseph A. Sinn, Vice President,
    "Title Guaranty & Surety Company,
        "Scranton, Pa.
"*Dear Sir:*

"I have been instructed by the executive committee of this company to say to you that the proposition made you in New York was not open to your acceptance at any time you might elect but was for your acceptance or rejection at the time it was offered to you.

"The executive committee directs me further to say
that if the Federal Surety Company has any liability
to your company in the Glazier matter it will have to
be determined by an action at law and if your company
thinks it has a case against us we shall be very glad
to pay any judgment which you may obtain.
                    "Yours very truly,
                              "C. M. ABBOTT,
                                   "Vice President."

Sinn immediately replied, expressing surprise at the
attitude taken by Abbott, and the latter again
wrote, stating that the executive committee did not
believe that the defendant company was morally or
legally liable, and that it was content to leave the ques-.
tion of liability to the courts. The claim was then
placed by the surety company with its attorney at
Detroit, who wrote to the defendant company request-
ing a settlement. Mr. Abbott replied on September 20,
1912, as follows:

"This alleged offer of $2,500 was made by me and
declined by the Title Guaranty & Surety Company.
Some weeks later they announced their willingness to
accept the $2,500. There was nothing said about the
Title Guaranty being free to change their minds at
any time they saw fit in the future. The offer was
made for two reasons: One was that we figured that
it would take about that sum to beat the hocus pocus
claim the Title Guaranty & Surety Company alleged
against us. The other was it was intimated to us that
unless we met the demand of the Title Guaranty Surety
Company, our license to do business in Michigan would
be canceled. Their demand was for a much greater
sum than $2,500, and we absolutely refused to con-
tribute anything to them beyond an amount that we
considered it would cost to beat this so-called claim
and that amount the Title Guaranty & Surety Com-
pany's representative, Mr. Joseph Sinn, declined to
accept. Later on, when he found he could not get any
more, he changed his mind and agreed to accept it.
We were buncoed out of $57,500 once before, by a
threat of expulsion from the State of Michigan. We
do not have any fear at the present moment of any

threats that may be fired at us from any official of the State of Michigan. We do not think it will cost us $2,500 to beat the Title Guaranty & Surety Company's alleged claim. At any rate, we are perfectly willing to have a try at it."

Subsequently the Title Guaranty & Surety Company assigned its claim to the plaintiffs, and the instant suit was brought.

At the trial Mr. Abbott testified that, during the time covered by the negotiations, he was second vice president of the defendant company; that his duties were to look after the underwriting of the company, secure business for it, and the management of its agency affairs; that the control of authority in regard to settling claims was in the hands of the executive committee; that his authority to bind the company to adjustments was limited to the amount of $500 or less; that, if it was more than $500, the case was reported to the executive committee, and that committee passed upon whether it should be paid or resisted, and at that time the executive committee was located at Dallas, Tex.; that Mr. Wofford was president and a member of the executive committee.

At the close of the evidence defendant requested the court to direct a verdict in its favor on the grounds:

(1) That no contract had been entered into between plaintiffs' assignor and defendant.

(2) That Abbott had no authority to bind the Federal Union Surety Company to contribute $2,500.

The motion was granted by the court upon the first proposition. The court in the course of its opinion said:

"I am of the opinion that the counter proposition might be treated by the Federal Union Surety Company as a rejection of its offer of $2,500. It was not an acceptance. Did the act of Mr. Sinn, instead of accepting, merely in making a counter proposition offer a new and different contract, still save to him the right

to come back and accept? I am satisfied that under the evidence in this case, and under the statement that that proposition would be submitted to the executive committee of the defendant company, the Title Guaranty & Surety Company lost its right, if it could not get what it was demanding, to come back and say, 'We will take what you offered.' "

Judgment having followed the directed verdict for the defendant, the plaintiffs have brought the case here by writ of error to review the court's action, and it is said that the two questions involved are whether Abbott had authority, express, or implied, to make the offer that his company would pay $2,500, and, if so, whether the offer was accepted, so as to constitute a contract.

1. As only the latter question was considered by the court, counsel have first discussed it in their briefs and arguments. Counsel for appellants say plaintiffs' evidence establishes the fact, so far as the court is concerned, upon the question of allowing the case to go to the jury, that Abbott agreed that his company would contribute $2,500 to a settlement of the claims of the State against the Title Guaranty & Surety Company and other sureties upon Glazier's bonds. No question is raised by the defendant as to the consideration for the contract or legality of the object to be attained. It is only the right of the Title Guaranty & Surety Company to accept this offer, after its representative had expressed the hope that a larger sum would be forthcoming, that is here questioned. Manifestly the evidence must be considered in the light most favorable to the plaintiffs. If an intention can be gathered from the interviews and correspondence that the parties intended to be bound in contract, it is a question for the jury and not for the court.

It is not the claim of the plaintiffs here that any agreement was consummated at the interview in New

York. It is their claim that a proposition was there made by the defendant, which the plaintiffs' assignor afterwards accepted. The interview between Sinn and Abbott in Indianapolis is pertinent. The correspondence following that interview down to the letter of July 3d are inquiries relative to the attempt to get an increased offer from defendant. We are of opinion that the letter of July 3d is a complete acceptance, although it is true that it reiterated the hope that defendant would be more liberal and pay the larger sum. In it Sinn says in effect:

"We think you ought to pay us $3,333.33, but if you will not pay that sum we will take $2,500, which please send."

Going back to the interview with Abbott, we do not think it can be considered a rejection of the offer of $2,500. According to the testimony of Sinn, in the same conversation reference was made to the offer of $2,500 which Abbott had agreed to. The Title Guaranty & Surety Company was engaged in an effort to effect a compromise with the State of the claim that was made primarily against it, but which might rest ultimately in some measure upon the defendant. The parties were seeking to arrive at an equitable adjustment between themselves of their liabilities to the State. We think that even Abbott's testimony as to what occurred at that interview would be sufficient to carry the question to the jury. We think the cases cited by appellants, are to the effect that the mere inquiry as to the terms of the proposal, or a request to modify or change the offer, does not have the effect of rejecting the offer, and, if the offer has not been revoked, a party may accept it, although he previously asked the proposer to modify it.

In 1 Elliott on Contracts (1913 Ed.), § 41, that author says:

"The rejection of an offer terminates it, and it is beyond the power of the acceptor to revive the proposal by a subsequent acceptance. However, a mere inquiry as to the terms of the proposal, or a request to modify or change the offer, does not have the effect of rejecting the offer, and, if the offer has not been revoked, a party may accept it, although he previously asked the proposer to modify it."

We have considered the correspondence carefully, as well as plaintiffs' version of the interview with Abbott at Indianapolis, and we do not find therein any rejection of the original offer of $2,500, as contended by appellee. *Stevenson, Jaques & Co.* v. *McLean*, 5 Q. B. Div. 346; *Phillips* v. *Moor*, 71 Me. 78; 6 Ruling Case Law, p. 608. Pollock in his work on Contracts (page 40 [2d Am. from 4th Eng. Ed.] and notes by G. H. Wald), says:

"An acceptance may be complete, though it expresses dissatisfaction at some of the terms, if the dissatisfaction stops short of dissent, so that the whole thing be described as a 'grumbling assent.' "

We are impressed with the claim of the plaintiffs that the most that can be inferred that is favorable to defendant's position from the interview at Indianapolis, and the letter of July 3, 1912, is that they constituted a "grumbling assent" on the part of Sinn to Abbott's former proposal of $2,500. We think that the learned trial court erred in directing a verdict for the defendant upon the ground stated.

2. As to Abbott's authority, we are saved any lengthy discussion of this question by the statement of Mr. Abbott in his letter of August 6, 1912, in which he states:

"I have been instructed by the executive committee of this company to say to you that the proposition made to you in New York was not open to your acceptance at any time you might elect, but was for your

acceptance or rejection at the time it was offered to you."

Mr. Abbott testified that he had authority to submit propositions of this kind to the executive committee and to report the same. We think it must be held, therefore, that the statement here of the writer of this letter is virtually the statement of the executive committee. In it no claim is made that the proposition was not made in New York, as claimed by the plaintiffs, or that Abbott had no authority to make it, but the claim is that the acceptance or rejection should have been made when offered. We do not think that this position is sustained by the record. It clearly appears that Mr. Sinn was to submit this proposition to his home office and report later to the defendant and other surety companies. And at least it would be a question for the jury as to whether the acceptance was made within a reasonable time. To the same effect is the letter of Mr. Abbott to the attorney for the plaintiffs' assignor of September 20, 1912. We are of opinion, therefore, that the learned trial court erred in directing a verdict and judgment for the defendant, and that the case should have been submitted to the jury under proper instructions.

For these errors the judgment is reversed, and a new trial ordered.

BROOKE, C. J., and STONE, OSTRANDER, MOORE, and STEERE, JJ., concurred. KUHN and BIRD, JJ., did not sit.

The late Justice MCALVAY took no part in this decision.