******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

AL DENTE, LLC, ET AL. *v.* RICHARD E. CONSIGLIO, EXECUTOR (ESTATE OF FLORA CONSIGLIO), ET AL. (AC 38279)

DiPentima, C. J., and Prescott and Alander, Js.

*Argued December 6, 2016—officially released March 21, 2017*

(Appeal from Superior Court, judicial district of New Haven, Frechette, J.)

*Laurence V. Parnoff*, with whom, on the brief, was *Laurence V. Parnoff, Jr.*, for the appellants (plaintiffs).

*Daniel P. Scholfield*, with whom, on the brief, was *Hugh F. Keefe*, for the appellees (named defendant et al.).

*Lawrence J. Greenberg*, for the appellee (defendant Ruth Consiglio).

*Opinion*

PRESCOTT, J. The plaintiffs, Al Dente, LLC, and Carmine Capasso, appeal from the summary judgment rendered by the trial court in favor of the defendants, Robert G. Consiglio, Ruth F. Consiglio, and Richard E. Consiglio, individually, and as executor of the estate of Flora Consiglio. The plaintiffs claim that the court improperly concluded that no genuine issue of material fact existed as to any count of their operative complaint. We affirm the judgment of the trial court.

Mindful of the procedural posture of the case, we set forth the following facts as gleaned from the pleadings, affidavits, and other proof submitted, viewed in a light most favorable to the plaintiff. See *Martinelli* v. *Fusi*, 290 Conn. 347, 350, 963 A.2d 640 (2009). The defendants are owners of Sally's Apizza (Sally's), a culinary landmark on Wooster Street in New Haven. In 2013, the defendants entertained offers to purchase Sally's and the land on which it is situated. One such offer was made on December 3, 2013, by "Al Dente, LLC, a to be formed Connecticut limited liability company" comprised of Capasso and five other individuals, including his brother, Vincent Capasso, Kristen Keslow, Marc Keslow, and Tara Knight (collectively, original entity).[1] Weeks earlier, the original entity had retained Brenner, Saltzman & Wallman, LLP (law firm), to help prepare that offer and to organize Al Dente, LLC. The November 26, 2013 retainer agreement furnished by the law firm and "[a]ccepted, acknowledged, and agreed to" by Capasso was addressed to six individuals—Knight, Capasso, Kristen Keslow, Marc Keslow, Vincent, Capasso's brother, and Giuseppe DeLucia—and outlined "the terms and conditions upon which [the law firm] will undertake to represent you. . . . In connection with the organization of Al Dente, LLC, we will undertake to represent the new entity and the six of you collectively in your capacity as organizers and initial owners of Al Dente, LLC."[2] The law firm drafted the December 3, 2013 written agreement to purchase Sally's, which Capasso signed on behalf of the original entity.

The defendants received several bids in excess of one million dollars. Capasso thereafter grew concerned that the original entity's bid was being "used to get [other bidders] to offer more and to increase [the] purchase price . . . ." He therefore informed the defendants that the original entity would not "continue with the purchase of Sally's unless [they] came to an agreement [on] a bidding process to set the [c]ontract purchase price and to keep final bids confidential." On March 27, 2014, members of the original entity met with certain defendants and their legal representatives, at which time they orally agreed to the following protocols regarding the bidding process for the purchase of Sally's (collectively, bidding agreement): (1) initial bids would

be disclosed to all parties presenting offers; (2) final bids would be due by 5 p.m. on April 14, 2014; (3) the identities of the bidding parties would remain confidential; (4) any bids submitted after that deadline would not be accepted; and (5) the highest bid would set the sale price. The defendants further agreed to "commence negotiations for sale with the highest bidder" following the submission of final bids. Consistent with the foregoing, Attorney Robert W. Lynch, acting on behalf of the defendants,[3] disclosed the results of the first round of bidding in an April 7, 2014 e-mail to the bidding parties. In that correspondence, Lynch also apprised the parties that "[t]here will be one more round of bidding with all bids due by 5 p.m." on April 14, 2014.

Capasso submitted a timely second bid on behalf of the original entity in an April 14, 2014 e-mail to Lynch. Attached to that e-mail was a letter addressed to the defendants regarding the "Purchase and Sale of Assets and Real Property." That correspondence contained a proposed "agreement [that] sets forth the terms and conditions for the acquisition . . . of the pizzeria business known as Sally's . . . together with the real property located at 237 and 245 Wooster Street . . . ." Twelve pages in length, that proposed agreement states that it "contains all material terms and conditions of the Purchase Transaction and is intended to obligate Seller and Purchaser to consummate the transactions contemplated hereby. It is, accordingly, the intent of the parties hereto that this agreement constitute a legally binding and enforceable agreement." The proposed agreement also contains a merger clause, as § 9 (c) states that "[t]his agreement constitutes the entire agreement among the parties with respect to the matters covered hereby and supersedes all prior agreements, understandings, offers, and negotiations (oral or written). This agreement may be amended or modified only by a subsequent agreement in writing signed by each of the parties." The proposed agreement concludes by prescribing an exclusive method of acceptance, stating: "If you are in agreement with the terms of this agreement, please so indicate by countersigning this letter in the appropriate space below, whereupon this agreement shall become a binding agreement among the signatories hereto." None of the defendants signed that agreement.

At approximately 5:30 p.m. on the evening of April 14, 2014, Lynch e-mailed the bidding parties and disclosed the amounts of two new bids.[4] He further stated that "[w]e plan to meet with the [defendants] to go over the new bids and negotiate the terms and conditions of the purchase agreement." After learning that the original entity was the high bidder, Capasso emailed Lynch on April 15, 2014, stating in relevant part: "Please let us know if you need to meet with us to go over the terms of our proposal. Look forward to working with you." The following day, Knight e-mailed Lynch. Noting

that "[f]rom your e-mail it appears we have the highest offer," Knight inquired as to the "next step" in the process.[5] On April 17, 2014, Lynch replied that "Greenberg and I need to review your contract with our clients and make a list of issues that need to be worked out."

On April 21, 2014, Capasso again e-mailed Lynch, stating that he was "following up to see if any terms within our bid need to be worked through."[6] Capasso further stated that "[d]uring our [March 27, 2014] meeting with the [defendants] the parameters of the sale were brought up and we were informed that the highest price at the last bid would prevail and that the terms of the sale would be worked out. It has been brought to my attention that the condition of expansion and the pizza [oven] are not acceptable to the [defendants]. Please strike this term from our proposal. Please let us know if there are any other terms within our proposal that are not acceptable to the [defendants] and we will work out those terms as well" Lynch subsequently informed Capasso that he needed to meet with his clients "to go over the contract and see what issues they have. We will then prepare a joint response with [Greenberg] and his client and will send the joint response to you for your review and comment."

On May 9, 2014, Lynch sent an e-mail to the law firm, which stated simply: "Here are the comments of the [defendants] to the latest Al Dente proposal." Attached to that e-mail was a one page document containing nine comments regarding the April 14, 2014 agreement (comment sheet).[7] In an e-mail sent to the law firm later that day, Capasso stated that "[o]ur group will be meeting to discuss the comments this weekend."[8]

On May 14, 2014, Capasso sent Lynch a two sentence letter that reads: "Enclosed, please find our signed counter offer with our deposit check for Sally's. Please get back to us with a closing date."[9] Appended to that letter were two documents. The first was a cashier's check in the amount of $333,000 payable to "Robert W. Lynch Trustee" and "Lawrence J. Greenberg Trustee." The second was a modified version of the comment sheet, to which the following had been added: "Addendum To Contract Signed 4/14/2014. The foregoing nine (9) terms submitted by the Seller are hereby confirmed to be additional to the Contract signed 4/14/2014 and are made a part thereof" (addendum sheet).[10] Capasso signed that document, as did a notary public and two "witnesses" thereto.[11] Notably, that document was not signed by any of the defendants.

As Robert G. Consiglio swore in his affidavit, the defendants instructed Lynch "to return the unsolicited 'deposit check.'" By letter dated May 20, 2014, and addressed to Attorneys Samuel M. Hurwitz and Jennifer Deakin at the law firm, Lynch stated: "Enclosed please find the unsolicited cashier's check which was delivered to our office last week." Later that day, Deakin emailed

Lynch and Greenberg to inform them that "[o]ur client was troubled to learn that your clients do not believe they have a binding agreement with [the original entity] based on the bid procedures established by their counsel. [The original entity] believes it has a binding agreement with your clients as a result of the bid procedures and related events and remains ready, willing and able to complete the transactions on the basis of that agreement. Please advise on a closing date." Lynch replied approximately one hour later, stating that "[w]e don't have a binding agreement with any potential purchaser at this time nor has there been any decision as to who the purchaser will be. The [original entity's] bid is still being considered but no decision has been made."

Seven weeks later, Deakin sent a letter dated July 8, 2014, to Lynch and Greenberg, in which she communicated the original entity's concern that "your clients are continuing to solicit and/or consider bids to purchase Sally's . . . ."[12] Deakin stated that the original entity "won the bid to purchase Sally's pursuant to such sealed bid procedures, and, further, has a binding agreement with your clients to purchase Sally's." Deakin thus indicated that the original entity "remains ready, willing and able to consummate the closing of the purchase and sale of Sally's under the terms and conditions of its agreement with your clients that it has negotiated in good faith." If the defendants failed to proceed with the transaction, Deakin cautioned, the original entity was "prepared to take all measures, including legal action . . . ." Nevertheless, a majority of the members of the original entity ultimately voted against taking any legal action against the defendants, and so informed Capasso and his brother Vincent.

On July 19, 2014, a limited liability company operating agreement was executed for the entity known as Al Dente, LLC. That agreement was signed by Capasso and his brother Vincent, and described the two as sole and equal interest members thereof.[13] Capasso thereafter retained the counsel of Attorney Laurence V. Parnoff, who prepared a complaint on behalf of the plaintiffs, which was served on the defendants on August 20, 2014. That complaint contained three counts. The first sounded in breach of contract—specifically the breach of a purchase agreement stemming from the comment sheet, which the plaintiffs characterized as a "counteroffer," acceptance of which allegedly was memorialized in the addendum sheet. The second count alleged breach of the bidding agreement.[14] The third count, derivative of the second, alleged a violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.[15]

In their respective answers, the defendants denied the substance of those allegations. Following a period of time in which the parties conducted extensive discovery,[16] the defendants moved for summary judgment in

February, 2005, claiming, inter alia, that "[t]here is no dispute of fact that the parties never entered into a contract because there was no manifestation of mutual assent; further, submitting the highest bid does not establish an enforceable contract under Connecticut law . . . ." The plaintiffs, in turn, filed a memorandum of law in opposition. The court heard argument on the motion for summary judgment on June 16, 2015. By memorandum of decision dated August 10, 2015, the court concluded that no genuine issue of material fact existed as to whether the defendants entered into a purchase agreement with the plaintiffs. It further determined that no such issue existed with respect to the alleged breach of the bidding agreement.[17] Accordingly, the court rendered summary judgment in favor of the defendants on all counts, and this appeal followed.

Before considering the particular claims advanced by the plaintiffs in this appeal, we note the well-established standard of review governing a court's grant of summary judgment. "The fundamental purpose of summary judgment is preventing unnecessary trials." *Stuart* v. *Freiberg*, 316 Conn. 809, 822, 116 A.3d 1195 (2015). "Practice Book [§ 17-49] provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law . . . and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact. . . . A material fact . . . [is] a fact which will make a difference in the result of the case." (Internal quotation marks omitted.) Id., 820–21. "Summary judgment . . . is properly granted if the defendant in its motion raises at least one legally sufficient defense that would bar the plaintiff's claim and involves no triable issue of fact." (Internal quotation marks omitted.) *Serrano* v. *Burns*, 248 Conn. 419, 424, 727 A.2d 1276 (1999). Our review of a grant of summary judgment is plenary. *Stuart* v. *Freiberg*, supra, 821.

I

The plaintiffs' primary contention is that a genuine issue of material fact exists as to whether the defendants breached the bidding agreement by "unilaterally" withdrawing from negotiations. We disagree.

Construed in a light most favorable to the plaintiffs, the affidavits and other proof presented indicate that the parties reached an agreement on March 27, 2014, regarding the terms of the bidding process. The plain-

tiffs maintain, and the defendants concede, that the defendants at that time agreed that they would "commence negotiations for sale with the highest bidder" following the submission of final bids on April 14, 2014. As high bidder, the plaintiffs contend that they "had the right and the [d]efendants had the duty to have negotiations of the terms" of the April 14, 2014 proposed agreement.

It is undisputed that such negotiations transpired between the parties, as the plaintiffs acknowledge in their appellate brief.[18] Following the conclusion of the bidding period, the defendants notified the original entity that they were reviewing its proposal to "negotiate the terms and conditions of the purchase agreement." Approximately one week later, Capasso contacted Lynch and offered to remove certain details from the pending proposal, stating: "It has been brought to my attention that the condition of expansion and the pizza [oven] are not acceptable to the [defendants]. Please strike this term from our proposal. Please let us know if there are any other terms within our proposal that are not acceptable to the [defendants] and we will work out those terms as well." In response, Lynch advised Capasso that the defendants would review that proposal and then "send [a] response to you for your review and comment." The defendants thereafter circulated the comment sheet to the plaintiffs, at which time Capasso prepared and signed the addendum sheet, which he mailed to the defendants' representatives along with a deposit check. On May 20, 2014, Lynch returned that check to the law firm. Negotiations between the parties at that point ceased.[19]

On appeal, the plaintiffs argue that the defendants breached the terms of the bidding agreement by "unilaterally abandoning" those negotiations. No such allegations, however, are contained in the plaintiffs' complaint, nor were such allegations advanced in the proceeding before the trial court. Construed in the light most favorable to the plaintiffs, the complaint and related documentation establishes, at best, a contractual duty on the part of the defendants to engage in preliminary negotiations over the terms of a purchase agreement. Absent from the complaint are any allegations that the defendants acted in bad faith or that the bidding agreement required negotiations of a certain character or duration. See, e.g., *Grenier* v. *Commissioner of Transportation*, 306 Conn. 523, 537, 51 A.3d 367 (2012) (pleadings must provide sufficient notice of facts claimed and issues to be tried and cannot surprise or prejudice opposing party); *A-Right Plumbing, Sewer & Water Main Co., LLC* v. *Aquarion Operating Services Co.*, 282 Conn. 612, 613, 922 A.2d 1084 (2007) (summary judgment rendered when plaintiff "never raised" specific claim in its complaint). The materials that accompanied the plaintiffs' opposition to the motion for summary judgment likewise do not contain

any evidence to substantiate such allegations. See *Feliciano* v. *Autozone, Inc.*, 316 Conn. 65, 72–73, 111 A.3d 453 (2015) (party opposing motion for summary judgment must provide evidentiary foundation to demonstrate existence of genuine issue of material fact).

The record before us indicates that the defendants agreed to engage in negotiations following Capasso's submission of the highest bid. The record further indicates that those negotiations transpired. We, therefore, agree with the trial court that no genuine issue of material fact exists as to whether the defendants breached the bidding agreement with the plaintiffs by concluding negotiations on May 20, 2014. For that reason, the court properly rendered summary judgment on the second count of the complaint, as well as the derivative CUTPA claim.

II

We next consider whether a genuine issue of material fact exists as to whether the defendants entered into a binding purchase agreement with the plaintiffs, as alleged in the first count of the complaint. That count alleges in relevant part that "[b]y May 14, 2014, the [p]laintiffs and [d]efendants entered into an agreement, by the terms of which the [p]laintiffs agreed to buy and [the defendants] agreed to sell [Sally's] for a single cash payment . . . ." That agreement, the complaint alleges, sprung from the "[p]laintiffs' acceptance of the [d]efendants' counteroffer to the agreement . . . ." We conclude, from the pleadings, affidavits, and other proof submitted, that a binding agreement to purchase Sally's was never reached by the parties.

At the outset, we note what is not at issue. Under Connecticut law, "[a] bid is a binding offer to make a contract. . . . A bid . . . submitted in response to an invitation for bids is only an offer which, until accepted . . . does not give rise to a contract between the parties." (Citation omitted.) *John J. Brennan Construction Corp., Inc.* v. *Shelton*, 187 Conn. 695, 702, 448 A.2d 180, 184 (1982). On April 14, 2014, the plaintiffs submitted a final bid to purchase Sally's and the real property on which it is situated, which was accompanied by a written proposal delineating the terms and conditions thereof.

By its plain language, that proposed agreement required the signatures of the defendants to establish "a binding agreement among the signatories hereto." The record reflects that none of the defendants ever signed that agreement. It further is undisputed that, upon receipt of the deposit check and addendum sheet prepared and signed by Capasso, the defendants did not sign the addendum sheet and directed their counsel to return that check. Accordingly, there is no claim in this case that the defendants entered into a purchase agreement by accepting either the April 14, 2014 pro-

posed agreement or the May 14, 2014 addendum sheet.

Rather, the plaintiffs submit that a genuine issue of material fact exists as to whether the defendants, in circulating the comment sheet, intended to surrender their power of acceptance and bind themselves to a purchase agreement with the plaintiffs. In the plaintiffs' view, the comment sheet, when "read within [context of] the email and document chain," constituted a counteroffer that incorporated the terms of the April 14, 2014 proposed agreement in all material respects, as augmented by the nine specific comments detailed in the comment sheet.[20] We disagree.

The April 14, 2014 proposed agreement, the terms of which the defendants allegedly incorporated into that counteroffer, required the signatures of all interested parties. That requirement certainly was understandable, as the agreement, because it involved the conveyance of real property, implicated the statute of frauds and, thus, required it to be signed.[21] The comment sheet, however, was not signed by *any* of the defendants in this case.

Beyond that glaring, and perhaps fatal, deficiency, the record reveals no basis on which the finder of fact objectively could conclude that the defendants intended the comment sheet to constitute a counteroffer that terminated their power of acceptance. See *Cavallo* v. *Lewis*, 1 Conn. App. 519, 521, 473 A.2d 338 (1984) (counteroffer terminates offeree's power of acceptance). As the Restatement (Second) of Contracts explains, "[a] mere inquiry regarding the possibility of different terms . . . or a comment upon the terms of the offer, is ordinarily not a counter-offer. Such responses to an offer may be too tentative or indefinite to be offers of any kind." 1 Restatement (Second), Contracts § 39, comment (b), p. 106 (1981); accord 1 E. Farnsworth, Contracts (3d Ed. 2004) § 3.20, pp. 314–15 ("mere request for modification . . . does not ordinarily" constitute counteroffer). Several of the concerns raised in the comment sheet are highly tentative and indefinite in nature. For example, the third comment states that "[o]ur accountants suggest allocating the purchase price" in a certain manner, while the sixth comment vaguely states that "[w]e need an exception to the confidentiality provision for attorneys, accountants and advisors." Similarly, the eighth comment states that "Ruth Consiglio would like a license" to access a grapevine on the property being conveyed. Such generalized concerns do not resemble the sort of definitive contractual terminology commonplace in million dollar purchase agreements.

Equally significant, the defendants steadfastly characterized the concerns raised in the comment sheet as "issues" and "comments" regarding the plaintiffs' April 14, 2014 proposed agreement. For example, in an April 21, 2014 email, Lynch advised Capasso that the defen-

dants "will give you a complete list of comments for you to review with your group after we have completed our review of the contract." In a similar email to Knight on April 17, 2014, Lynch stated that he needed "to review your contract with [the defendants] and make a list of issues that need to be worked out." In a final communication that preceded the circulation of the comment sheet, Lynch informed Capasso that he and Greenberg were preparing "a joint response" that they "will send to you *for your review and comment*." (Emphasis added.) Those communications give context to the comment sheet, a stark one page document bereft of any letterhead, date, signatures, or identification of parties that merely enumerates nine concerns with the plaintiffs' proposed agreement. In addition, we note that the comment sheet is titled "Comments to Al Dente Contract" and contains no representation that it was intended either to terminate the defendants' power of acceptance or to constitute a counteroffer that bound the defendants thereto. See, e.g., *Great Lakes Communication Corp.* v. *AT&T Corp.*, 124 F. Supp. 3d 824, 849 (N.D. Iowa 2015) ("a mere 'inquiry' about different or better terms does not necessarily amount to a counteroffer"); *Hubble* v. *O'Connor*, 291 Ill. App. 3d 974, 980, 684 N.E.2d 816 (1997) ("simply because a communication discusses the possibility of modification does not necessarily mean that the communication is a demand for modification"); *LD III, LLC* v. *BBRD, LC*, 221 P.3d 867, 873 (Utah App. 2009) ("[t]he expression of . . . a desire [to possibly vary certain terms in a contract] does not rise to the level of a counteroffer"). Indeed, the record plainly indicates that the defendants anticipated further comment from the plaintiffs following the circulation of the comment sheet, as Lynch informed Capasso on April 23, 2014.

" '[R]equests' and 'suggestions' do not . . . constitute counteroffers." 1 A. Corbin, Contracts (Rev. Ed. 1993) § 3.39, p. 518. This is so because, in such instances, "there is no rejection of the offer." Id.; see also *Jaybe Construction Co.* v. *Beco, Inc.*, 3 Conn. Cir. Ct. 406, 411, 216 A.2d 208 (1965) ("[a] mere inquiry as to whether one proposing a contract will alter or modify its terms does not amount to a rejection"); *Johnson* v. *Federal Union Surety Co.*, 187 Mich. 454, 466, 153 N.W. 788 (1915) ("the mere inquiry as to the terms of the proposal, or a request to modify or change the offer, does not have the effect of rejecting the offer, and, if the offer has not been revoked, a party may accept it, although he previously asked the proposer to modify it"). Although it articulates various issues that the defendants had with the April 14, 2014 proposed agreement, the comment sheet does not contain any rejection— explicit or implicit—of that proposal. Moreover, when read in context of the communications between the parties, it is apparent that the defendants did not so intend. The defendants, through their counsel, repeat-

edly advised members of the original entity that they would be making "comments" on the proposed agreement. Prior to circulating the comment sheet, the defendants informed Capasso that they anticipated his "review and comment" thereon. Likewise, in his May 20, 2014 letter to the law firm on behalf of the defendants, Lynch indicated that "[t]he Al Dente bid is still being considered but no decision has been made."

A counteroffer serves to terminate an offeree's power of acceptance. *Cavallo* v. *Lewis*, supra, 1 Conn. App. 521; 1 Restatement (Second), supra, § 39 (2). The issue, then, is whether a triable issue of material fact exists as to whether the defendants, in circulating the comment sheet, so intended.

In his affidavit, Capasso averred that he "received the [comment sheet] as the [defendants'] counter offer as [the defendants] intended them to be." That perception, however, has little bearing on the issue before us. It is well established that "general averments will not suffice to show a triable issue of fact." *Farrell* v. *Farrell*, 182 Conn. 34, 39, 438 A.2d 415 (1980). Rather, an evidentiary showing "is indispensable" to avoiding summary judgment. Id.; see also *White* v. *Mazda Motor of America, Inc.*, 313 Conn. 610, 632, 99 A.3d 1079 (2014) ("the plaintiff must come forward with real evidence, not mere assertions"). As this court has observed, "[t]he mere fact that the plaintiff believed [certain actions or documents] to constitute a contract does not bind [the defendant] without some evidence that it intended to be bound to such a contract." (Internal quotation marks omitted.) *Morrissey-Manter* v. *Saint Francis Hospital & Medical Center*, 166 Conn. App. 510, 521, 142 A.3d 363, cert. denied, 323 Conn. 924, A.3d (2016).

In that same vein, we note that Connecticut subscribes to what our Supreme Court has termed the "objective theory" of contracts. *Connecticut Light & Power Co.* v. *Proctor*, 324 Conn. 245, 267, A.3d (2016). Accordingly, the proper inquiry concerns not how Capasso perceived the comment sheet, but rather whether the defendants, through their words and acts, manifested an objective assent to surrender their power of acceptance and bind themselves to the terms of the April 14, 2014 proposed agreement, as augmented by the concerns articulated in that comment sheet. See id., 267–68; accord 1 R. Lord, Williston on Contracts (4th Ed. 2007) § 4:1, p. 325 ("[i]n the formation of contracts . . . subjective intent is immaterial, so that mutual assent is to be judged only by overt acts and words rather than by the . . . subjective or secret intention of the parties"). In light of the stark and informal nature of the comment sheet, its content, and the context in which it arose, it cannot reasonably be claimed that the comment sheet constituted a binding counteroffer. All of the objective evidence submitted in the present case indicates that the comment sheet

was a written expression of the defendants' comments "upon the terms of the offer"; 1 Restatement (Second), supra, § 39, comment (b); and suggestions as to what might make the plaintiffs' proposal palatable to them. Such comments and suggestions do not constitute a counteroffer. 1 A. Corbin, supra, § 3.39.

In the end, it is important to recognize that "[t]o constitute an offer and acceptance sufficient to create an enforceable contract, each must be found to have been based on an identical understanding by the parties." (Internal quotation marks omitted.) *Saint Bernard School of Montville, Inc.* v. *Bank of America*, 312 Conn. 811, 830, 95 A.3d 1063 (2014). Although Capasso claims to have understood the comment sheet to be a counteroffer that terminated the defendants' power of acceptance, there simply is no objective evidence in the record to indicate that the defendants shared that understanding. Accordingly, we conclude, on the basis of the pleadings, affidavits, and other proof submitted, that no triable issue of fact exists as to whether the defendants intended to so bind themselves when they circulated the comment sheet to the plaintiffs. The trial court, therefore, properly rendered summary judgment on the first count of the complaint.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] We recognize that Al Dente, LLC, was not formally organized until months later. It nevertheless remains that multiple offers to purchase Sally's were made by a to be formed entity bearing that nomenclature. For convenience, we refer to that bidder as the original entity.

[2] The record before us contains no further reference to "Giuseppe DeLucia." Rather, the parties, in various communications, affidavits, and deposition testimony, refer to either "Alphonse DeLucia" or "Alphonse DeLuca" as a participant in the original entity's attempt to acquire Sally's. In his February 5, 2015 affidavit, for example, Marc Keslow averred in relevant part: "In mid-2013, I was approached by Tara Knight. Tara informed me that she had been investigating the possible purchase of [Sally's] along with an acquaintance of hers, Alphonse DeLuca. The two had learned that the owners of Sally's were quietly soliciting offers for purchase. Accordingly, Alphonse DeLuca and Tara Knight were in the process of finding additional members to be co-owners of an LLC that would bid on the purchase of Sally's . . . . In mid-late 2013, I, Kristen Keslow, Alphonse DeLuca, Tara Knight, Carmine Capasso and an individual I understood to be Alphonse DeLuca's father held a meeting to discuss the formation of the new LLC. Subsequently, I, along with Kristen Keslow, Alphonse DeLuca, Tara Knight, Carmine Capasso and Carmine's brother . . . agreed to be part of a new LLC that would be called 'Al Dente LLC.' [We were to be the] members and co-owners of Al Dente, LLC . . . . The six members, including myself, subsequently entered into a retainer agreement dated November 26, 2013 with [the law firm] to form the LLC and to represent the LLC throughout any negotiations concerning the potential purchase of Sally's." In his deposition testimony, Capasso acknowledged that "Alphonse DeLucia" was his cousin and "an investor" in Al Dente, LLC.

[3] At all relevant times, Lynch served as counsel to all the defendants save Ruth Consiglio, who was represented by Attorney Lawrence J. Greenberg.

[4] Consistent with the terms of the bidding agreement, Lynch disclosed only the amounts of the new bids; the identities of the bidding parties remained confidential.

[5] Knight copied Capasso and the other members of the original entity on that correspondence.

[6] Capasso copied the other members of the original entity on that correspondence.

[7] A redacted copy of the comment sheet accompanied the defendants' motion for summary judgment. Titled "Comments To Al Dente Contract," it states:

"(1) The photos and memorabilia can be copied to the extent possible but the originals are not included in the sale.

"(2) The [redacted] dollar holdback is excessive. An escrow of [redacted] for Robert and [redacted] for Richard is acceptable. Furthermore, if Robert or Richard are prevented from assisting because of events beyond their control, such as death or illness, their participation should be excused.

"(3) Our accountants suggested allocating the purchase price as follows:

a. [Redacted] to equipment

b. [Redacted] to the parking lot (245 Wooster Street)

c. [Redacted] to 237 Wooster Street

d. [Redacted] to goodwill

"(4) The business and the two parcels of real estate are sold 'as is' with no contingencies.

"(5) The buyers will not be allowed to work in the business until after the closing.

"(6) We need an exception to the confidentiality provision for attorneys, accountants and advisors.

"(7) The condition of the assets is 'as is.'

"(8) Ruth Consiglio would like a license to access, maintain and harvest the grapes from the grapevine between the restaurant and the church.

"(9) The parties would like to receive payment of [redacted] for each additional location that is opened within the next 15 years."

[8] Capasso copied other members of the original entity on that correspondence.

[9] On that same date, the law firm filed articles of organization for Al Dente, LLC, with the secretary of state.

[10] "An addendum is defined in Black's Law Dictionary as '[s]omething to be added, esp. to a document; a supplement.' " *Meribear Productions, Inc.* v. *Frank*, 165 Conn. App. 305, 315 n.11, 140 A.3d 993, cert. granted on other grounds, 322 Conn. 903, 138 A.3d 288 (2016). In his deposition testimony, Capasso confirmed that he "put the addendum" on the comment sheet.

[11] In his deposition testimony, Capasso identified the two witnesses as his mother and his administrative assistant.

[12] The plaintiffs furnished no evidence of the solicitation of additional bids in their opposition to the motions for summary judgment and have not raised any claim related thereto in this appeal.

[13] In his December 12, 2014 deposition testimony, Capasso stated that Knight and other members of the original entity were not members of "the LLC." No party disputes that assertion. The membership of Al Dente, LLC, was not formally established until July 19, 2014—more than three months after the final bid was submitted to the defendants and almost eight months after the original entity retained the law firm to, among other things, organize Al Dente, LLC, and to prepare an operating agreement on its behalf.

[14] We note that paragraph sixteen of the plaintiffs' complaint alleges in relevant part that "[i]t was specifically required that Al Dente would participate in further bidding conditioned on . . . the high bidder [being] the purchaser." The plaintiffs have expressly abandoned any claim that the bidding agreement conferred on them a right to purchase, as they acknowledged in their appellate briefs and at oral argument before this court. Rather, their claim pertains to the defendants' obligation to engage in negotiations with the high bidder.

[15] The plaintiffs do not raise any distinct issue with respect to the CUTPA claim in this appeal.

[16] The recitation of facts in the plaintiffs' principal appellate brief concludes by stating that "[s]ummary judgment was entered, although at the time of the entry of summary judgment a [Practice Book §] 17-49 issue was raised because discovery had not been concluded." The brief contains no further reference to that allegation, and the plaintiffs have neither raised nor analyzed such a claim in this appeal. We therefore decline to further consider that bald assertion. See *Paoletta* v. *Anchor Reef Club at Branford, LLC*, 123 Conn. App. 402, 406, 1 A.3d 1238, cert. denied, 298 Conn. 931, 5 A.3d 491 (2010).

[17] In its memorandum of decision, the trial court also rejected the defendants' alternate contention that the plaintiffs lacked standing to maintain this action. The propriety of that determination is not at issue in this appeal.

[18] As the plaintiffs aver in their principal appellate brief: "After Capasso's highest bid, the [d]efendants met with their attorneys 'to go over the contract

and see what issues they have,' with [the April 14, 2014 proposed agreement]. Thereafter *negotiations with the* [d]efendants *began* with the [p]laintiffs' submission of [that] agreement to the [d]efendants. *Negotiations followed* with the defendants' attorneys' submission of [the comment sheet]." (Emphasis added.)

[19] Citing to the affidavits of Robert G. Consiglio and Ruth F. Consiglio, the plaintiffs argue in their appellate brief that the bidding agreement required the defendants "to engage in negotiations—*in the plural not singular*—with the [p]laintiffs" and that they did not do so. (Emphasis in original.) Even if we were to agree with this semantic distinction, the undisputed evidence indicates that (1) the plaintiffs commenced negotiations by submitting their April 14, 2014 proposed agreement; (2) it thereafter was—as Capasso swore in his affidavit—"brought to [Capasso's] attention" that certain aspects of the proposal were "not acceptable" to the defendants; (3) Capasso, in turn, contacted the defendants with direction to "[p]lease strike" those aspects from the proposal; (4) Lynch responded by informing Capasso that he would be reviewing the proposal with the defendants; (5) following that review, the defendants provided nine detailed comments on the proposal; (6) Capasso responded by creating and signing the addendum sheet and mailing it, along with a deposit check, to the defendants' representatives with the request that the defendants "get back to us with a closing date"; and (7) the defendants returned that check to the plaintiffs. Thus, there is no genuine issue of material fact that negotiations between the parties had occurred.

[20] We reiterate that, in preparing the addendum sheet, Capasso titled that document "Addendum to Contract signed 4/14/2014." That document describes the defendants' nine comments as "additions to the contract signed 4/14/2014 and made a part thereof."

[21] The alleged agreement that is the subject of this civil action involved the conveyance of real property known as 237 and 245 Wooster Street in New Haven. Pursuant to our statute of frauds, "[n]o civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the agent of the party, to be charged . . . upon any agreement for the sale of real property or any interest in or concerning real property . . . ." General Statutes § 52-550 (a) (4).