******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# KARAOKE HEROES NH, LLC *v.* RVRM ENTERPRISES, LLC
## (AC 48149)

Elgo, Suarez and Seeley, Js.

*Syllabus*

The plaintiff appealed from the trial court's judgment awarding damages to the defendant on the plaintiff's claim and the defendant's counterclaim for breach of a commercial lease. The fire marshal required the plaintiff to maintain a secondary egress, an emergency exit door, in order to operate as a karaoke bar. The emergency exit door opened into a parking lot operated by a nonparty, K Co., and bollards had been placed to block a parking space directly in front of the door to prevent vehicles from obstructing the emergency exit. K Co. had entered into a written license agreement with the plaintiff's predecessor for the use of the parking space, and, although the plaintiff continued to pay a license fee to K Co., the plaintiff never entered into a written license agreement with K Co. During the term of the lease, K Co. removed the bollards and reported to the fire department that the plaintiff no longer had a right of egress from the emergency exit door. The plaintiff claimed, inter alia, that the court erred in determining that the subject property was compliant with all relevant laws and regulations upon the execution of the lease and, thus, the defendant had not breached the lease. *Held*:

The trial court's findings that the premises was compliant with all relevant laws and regulations at the time the lease was signed were not clearly erroneous, as there was an implied emergency access agreement between K Co. and the plaintiff at that time because the license agreement between the plaintiff's predecessor and K Co. continued on a month-to-month basis between K Co. and the plaintiff due to the plaintiff's continued payment and K Co.'s continued acceptance of the monthly license fee.

The trial court properly determined that the defendant did not breach the lease by failing to provide the plaintiff with an egress agreement with K Co., as the only ingress and egress mentioned in the lease was an entrance accessed through an alleyway, not the emergency exit through the parking lot, and the lease explicitly required the plaintiff to be responsible to ensure that the premises was compliant with all applicable laws and regulations after signing.

The trial court properly determined that the defendant did not engage in any behavior that would constitute a violation of the Connecticut Unfair Trade Practices Act (§ 42-110a et seq.), as the plaintiff failed to establish that the defendant engaged in any unfair, illegal, wrongful, immoral or injurious behavior against the plaintiff.

Argued November 12, 2025—officially released March 3, 2026

*Procedural History*

Action to recover for damages for, inter alia, breach of contract, and for other relief, brought to the Superior Court in the judicial district of New Haven and transferred to the judicial district of Waterbury, Complex Litigation Docket; thereafter, the defendant filed a counterclaim; subsequently, the case was tried to the court, *Pierson*, *J.*; judgment for the defendant on the complaint and on the counterclaim, from which the plaintiff appealed to this court. *Affirmed*.

*Richard J. Rapice*, for the appellant (plaintiff).

*David C. Pite*, for the appellee (defendant).

*Opinion*

ELGO, J. The plaintiff and counterclaim defendant, Karaoke Heroes NH, LLC, appeals from the judgment of the trial court awarding the defendant and counterclaim plaintiff, RVRM Enterprises, LLC, damages for breach of a commercial leasehold contract.[1] On appeal, the plaintiff claims that the court erred in determining that (1) the property was compliant with all relevant laws and regulations upon the execution of the lease agreement and, therefore, the defendant had not breached the lease and (2) the defendant had not violated the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. We affirm the judgment of the trial court.[2]

The following facts, as either found by the court or as otherwise undisputed in the record, are relevant to

---

[1] For clarity, we refer to Karaoke Heroes NH, LLC, as the plaintiff and to RVRM Enterprises, LLC, as the defendant in this opinion.

[2] The plaintiff also claims that its breach of contract—its failure to pay rent and utilities—was excused due to the defendant's alleged breach of contract—namely, its failure to deliver the premises in compliance with all relevant laws and regulations and its failure to broker a license for continued emergency access to the parking lot with a nonparty, Kirk's Parking, LLC. In light of our conclusion that the court properly determined that the defendant did not breach the lease, this claim must fail. See part I of this opinion.

our resolution of this appeal. The present dispute stems from a commercial lease (lease) between the plaintiff and the defendant for the rear portion of the first floor of a building on a piece of real property located at 212 Crown Street in New Haven (premises). The lease describes the premises as "approximately 3500 [square feet] . . . the area accessed [from] the [alley] entryway through a door located on the [w]est side of said building and located to the south of the bathrooms." The plaintiff is a limited liability company, which is owned and operated solely by Dan Lebov. The plaintiff used the premises to run a karaoke style bar and nightclub. The defendant landlord is a limited liability company, which is owned in equal shares and operated by siblings Ronald LoRicco, Richard LoRicco, Vincent LoRicco, and Maria LoRicco.[3] A nonparty, the Anthony and Nina LoRicco Irrevocable Spray Trust,[4] owns the premises, and the premises is managed by the defendant.

The premises is located adjacent to real property located at 210 Crown Street, which is a parking lot owned by a nonparty, 210 Crown Street, LLC, and operated by a nonparty, Kirk's Parking, LLC (Kirk's). The premises' emergency exit door opens into the parking lot and requires bollards to block a parking space directly in front of the door to prevent vehicles from obstructing the emergency exit. The fire marshal required this emergency exit for the premises to operate as a karaoke bar.

210 Crown Street, LLC, and Kirk's are both owned by nonparties, MRVR, LLC (51 percent), and Sean McLaughlin (49 percent), respectively. MRVR, LLC, is owned by the LoRicco siblings in equal shares. As the court found in its memorandum of decision, "[t]here is

---

[3] Ronald LoRicco, Richard LoRicco, Vincent LoRicco, and Maria LoRicco will be referred to individually by first name and collectively as the LoRicco siblings in this opinion.

[4] A spray trust or sprinkle trust is "[a] trust in which the trustee has discretion to decide how much will be given to each beneficiary." (Internal quotation marks omitted.) *Platt* v. *Tilcon Connecticut, Inc.*, 196 Conn. App. 564, 565 n.1, 230 A.3d 854, cert. denied, 335 Conn. 917, 230 A.3d 643 (2020).

overlapping ownership . . . between the manager of the premises ([the defendant]), the owner of the parking lot ([MRVR, LLC]), and the parking lot's operator and manager (Kirk's). Collectively, and directly or indirectly, the LoRicco siblings are either the sole or majority owners of all three entities."[5]

The court found the following in its October 10, 2024 memorandum of decision: "[The premises] began operating as a bar or nightclub in the early 1990s," and "egress from a fire door, located at the rear of the premises and opening onto the parking lot, was required for safety. Moreover, when the premises first began to be used as a bar or nightclub, concrete bollards—or posts—were placed on either side of the fire door opening onto the parking lot . . . . The fire marshal required egress from the fire door, and the placement of the bollards, so that patrons and others could exit the premises without being blocked by a motor vehicle parked in front of or backing towards the door."

Prior to the plaintiff's lease of the premises, the defendant leased the premises to an entity known as Karaoke Heroes, LLC, which was owned by Andrew Lebwohl.[6] Karaoke Heroes, LLC, also entered into a written license agreement with Kirk's for "the parking space . . . located at [the parking lot] adjacent to the rear door of the [premises] for the purpose of providing an emergency access out of the [premises] into the parking lot . . . ." The agreement would continue "in full force and effect until terminated by either party . . . ." This agreement "allowed for egress from the rear fire door of the premises to the parking lot, as required by the fire marshal."

[5] We note that the only defendant remaining in this action is RVRM Enterprises, LLC, as the claims against the impleaded defendants—two state marshals, Robert Miller and Bruce Scott—were dismissed prior to trial. The plaintiff never brought an action against the LoRicco siblings in their individual capacities, and the plaintiff did not bring an action against the other related entities in this case, such as Kirk's, 210 Crown Street, LLC, or MRVR, LLC.

[6] We note for clarity that Karaoke Heroes, LLC, which is owned by Lebwohl, is a separate and distinct entity from the plaintiff, Karaoke Heroes NH, LLC, which is owned by Lebov.

Karaoke Heroes, LLC, employed Lebov, who came to manage the business' day-to-day operations. Lebwohl decided to sell the business to Lebov, who agreed to purchase it and formed the plaintiff for that purpose. On January 1, 2017, Lebwohl sold Karaoke Heroes, LLC, to the plaintiff. In addition to the sale of the business, Karaoke Heroes, LLC, assigned to the plaintiff "all its right, title and interest in the existing lease between [Karaoke Heroes, LLC], and [the defendant], which lease is dated February 1, 2012, and any and all modifications, assignments, and amendments relating thereto . . . ." Karaoke Heroes, LLC, did not assign to the plaintiff its rights under the parking space license agreement between itself and Kirk's, and the plaintiff did not enter into a separate agreement with Kirk's for the parking space. The plaintiff, however, continued to make monthly payments to Kirk's, as Lebov had done when he managed the day-to-day operations of Karaoke Heroes, LLC.

On July 6, 2018, the defendant as landlord and the plaintiff as tenant entered into a written lease agreement for the premises. The lease was also signed by Lebov as guarantor. The lease term was set for three years, expiring on June 30, 2021. The plaintiff agreed to lease the premises in its current condition. The lease explicitly defined the use as a "karaoke type night club" with any alterations to the design plan requiring the "written consent of the [defendant]." The lease stated that the defendant "covenants with the [plaintiff] that the [premises] is in compliance with all governmental laws, regulations, and ordinances; and thereafter [the plaintiff] shall, at its own cost and expense . . . comply with all governmental laws, ordinances, orders and regulations affecting the [premises] now in force . . . ."

The plaintiff made all required payments pursuant to the lease to the defendant from the beginning of the lease period to February, 2019. In March, 2019, the plaintiff failed to timely pay rent, and the defendant commenced a summary process action against the plaintiff. The plaintiff was defaulted for failure to appear in the summary process action, and the court subsequently rendered a

default judgment of possession in favor of the defendant. The defendant obtained an execution of judgment, which was served at the premises on July 24, 2019. The marshal executed the judgment on the same day, which execution was defective due to lack of sufficient notice. The plaintiff was removed from the premises despite the notice defect.

In August, 2019, the plaintiff appeared in the summary process action and moved for a writ of audita querela, for temporary injunctive relief, for sanctions, and to quash the execution.[7] At the hearing on the plaintiff's motion, the defendant "learned that the state marshal's execution of the judgment of possession was defective, insofar as sufficient notice had not been provided to the plaintiff; as a result, the defendant decided to withdraw the first summary process action." Also at the hearing, the defendant and Kirk's learned that the plaintiff did not have a written license agreement for the parking space into which the premises' emergency exit door opened.

After the defendant withdrew the first summary process action, the plaintiff regained possession of the premises and resumed business. The defendant attempted to "reinstate the plaintiff's lease, which it believed, in good faith, had been terminated by the [March, 2019] notice to quit." The plaintiff did not respond to the defendant's proposed lease reinstatement. "The plaintiff recommenced making . . . monthly payments to the defendant in August, 2019, which were made until January, 2020, after which the payments ceased."

After learning that there was "no written license agreement between the plaintiff and Kirk's regarding the

[7] A writ of audita querela "is a remedy granted in favor of one against whom execution has issued on a judgment, the enforcement of which would be contrary to justice because of (1) matters arising subsequent to its rendition, (2) prior existing defenses that were not available to the judgment debtor in the original action, or (3) the judgment creditor's fraudulent conduct or circumstances over which the judgment debtor had no control." (Internal quotation marks omitted.) *No. 2 Fraser Place Condominium Assn., Inc.* v. *Mathis*, 225 Conn. App. 534, 543, 316 A.3d 813, cert. denied, 350 Conn. 905, 323 A.3d 342 (2024).

required access to the parking lot," Kirk's proposed a new license agreement with the plaintiff for continued emergency exit access. The proposed license agreement "was somewhat more favorable" to Kirk's, and the members of Kirk's, MRVR, LLC, and McLaughlin, agreed that "Kirk's would not accept the plaintiff's tender . . . in August, 2019, absent a written license agreement." Kirk's, through counsel, sent the plaintiff a letter, stating that the plaintiff had until January 1, 2020, "to enter into [a] new license agreement with [Kirk's]. If an acceptable agreement is not reached, [Kirk's] intend[s] to remove the bollards and resume using the space in front of the door. Again, any entry [onto] [Kirk's] property will be treated as a trespass." The plaintiff refused to sign the proposed license agreement and did not otherwise negotiate with Kirk's for a new agreement. "Kirk's reported to the New Haven Fire Department that the plaintiff no longer had a right of egress from the back door of the premises to the parking lot. The plaintiff ceased full business operations at the premises in August, 2019.

"Thereafter, the plaintiff learned that the bollards were going to be removed, and the plaintiff sought a temporary injunction from the Superior Court, asking the court to enjoin the defendant from restricting the plaintiff's access to the rear fire door opening onto the parking lot. . . . The court . . . entered a temporary injunction on October 31, 2019, which reads, in part: `[T]he defendant . . . and each of its officers, servants, agents, and employees are commanded, enjoined and restrained, wholly and absolutely, from preventing the plaintiff's access to the emergency egress through the fire door on the premises that are the subject of the lease agreement between the parties during the pendency of this action and under further order of the court.' Despite this order, and after its issuance, Kirk's removed the parking bollards in front of the egress door in January, 2020; it did so, in part, based upon the belief that the order applied to the defendant only, and not to Kirk's.

"As a result of the removal of the bollards, the fire marshal did not renew the plaintiff's liquor license, effectively stopping the plaintiff from operating as a karaoke-style nightclub and bar. Lebov removed his equipment from the property in the early summer of 2020. Thereafter, the defendant instituted a second eviction action against the plaintiff, based on no right or privilege and lapse of time. The plaintiff agreed to leave the premises and surrendered possession voluntarily. The bollards were not reinstalled until after the plaintiff left the premises." (Citation omitted.)

The plaintiff commenced this action against the defendant on February 10, 2020. The plaintiff's operative complaint, the third amended complaint, alleged four counts.[8] In count two, the plaintiff alleged that the defendant breached the lease (1) by failing to lease the premises in compliance with all relevant laws and regulations, as required by § 10 of the lease; (2) by violating the plaintiff's right of quiet enjoyment under § 28 of the lease by filing the two summary process actions; and (3) by allowing a third party, Kirk's, to interfere with the plaintiff's quiet enjoyment of the premises, in violation of § 28 of the lease.[9] In count three, the plaintiff alleged that the

---

[8] In count one, the plaintiff alleged abuse of process stemming from two summary process actions brought by the defendant against the plaintiff and the defendant's alleged violation of an injunction. In count four, the plaintiff alleged that the defendant breached the lease's implied covenant of good faith and fair dealing by commencing two summary process actions against the plaintiff, damaging the plaintiff's property upon execution of the first summary process action, and interfering with the plaintiff's business and use of the premises. The plaintiff did not appeal the court's judgment as to counts one and four of its operative complaint—the abuse of process and breach of the implied covenant of good faith and fair dealing claims.

[9] Section 10 of the lease provides in relevant part: "At the commencement of this [l]ease, [the defendant] covenants with [the plaintiff] that the [premises] is in compliance with all governmental laws, regulations, and ordinances; and thereafter [the plaintiff] shall, at its own cost and expense . . . comply with all governmental laws, ordinances, orders and regulations . . . ."

Section 28 of the lease provides in relevant part: "The [defendant] covenants with [the plaintiff] that . . . it will suffer and permit [the plaintiff], upon paying the rents and performing all of the terms on its

defendant violated CUTPA by removing the bollards in the parking lot in violation of an injunction. By way of relief, the plaintiff sought compensatory damages, punitive damages, fees and costs.

On December 19, 2022, the defendant filed an answer, special defense and a counterclaim. The defendant denied liability and asserted seven special defenses.[10] In its counterclaim, the defendant alleged a single count of breach of contract for failure to pay rent and utilities owed under the lease. By way of relief, the defendant sought compensatory damages for the unpaid rent and utilities, interest, and attorney's fees pursuant to § 23 of the lease.[11] The plaintiff denied the allegations made by the defendant in its counterclaim and raised three special defenses.[12]

A court trial was held on February 15 and 16, and April 9, 2024. Ronald, Richard, Lebov, Attorney Earl Giovanniello, and Attorney Stuart Margolis testified at trial. Following trial, the court rendered judgment for the defendant on all counts of the plaintiff's complaint. Specifically, as to the plaintiff's breach of contract claim,

part to be performed, to occupy, possess and enjoy said premises during the term of the [l]ease without hindrance or molestation from the [defendant] or any mortgage, ground [l]ease or agreements to which this [l]ease is subordinated."

[10] The defendant's first special defense alleged that the plaintiff failed to mitigate damages. The second and third special defenses alleged contributory negligence and comparative negligence on the part of the plaintiff. The fourth special defense alleged a right of setoff or offset. The fifth special defense alleged a breach of the lease. The sixth special defense alleged that the COVID-19 pandemic and subsequent executive orders issued by Governor Lamont were the substantial cause of the plaintiff's damages. The seventh special defense alleged immunity on the basis of the conduct of state marshals acting in their official capacities.

[11] Section 23 of the lease provides in relevant part that the plaintiff "shall so pay all costs, expenses and reasonable attorney's fees incurred or paid by [the defendant] in successfully enforcing the terms of this [l]ease."

[12] The plaintiff's first special defense alleged constructive eviction against the defendant. The second special defense alleged unclean hands. The third special defense alleged the right of setoff. The plaintiff did not appeal the judgment regarding its three special defenses.

the court found that the monthly payments by the plaintiff to Kirk's for "parking" continued the license agreement between Kirk's and the plaintiff's predecessor on a month-to-month basis between Kirk's and the plaintiff. The court found that the month-to-month license with Kirk's for the emergency exit egress rendered the premises compliant with "all governmental laws, regulations and ordinances" at the time the lease commenced. After the lease commenced, the lease explicitly made such compliance the plaintiff's responsibility. The court thus found that the defendant did not breach § 10 of the lease. As to count three, alleging a violation of CUTPA, the court found that claim untenable in light of its finding that the defendant "did not engage in wrongful conduct with respect to the plaintiff's tenancy . . . ." The court did not address the defendant's special defenses.

In addition, the court rendered judgment in favor of the defendant on its breach of contract counterclaim. Specifically, the court determined that the plaintiff had breached the lease by failing to pay rent and utility bills. The court rejected the plaintiff's special defenses of constructive eviction, unclean hands, and setoff. The court thus awarded the defendant $93,905.40, plus costs, expenses, and reasonable attorney's fees. This appeal followed.[13]

## I

The plaintiff claims that the court incorrectly determined that the defendant did not breach the lease because

[13] Although the plaintiff challenges the propriety of the court's judgment with respect to its breach of contract claim, the plaintiff has not raised a distinct claim regarding the court's judgment concerning its right of quiet enjoyment claim. To the extent that the plaintiff briefly references that ruling in its appellate brief, it does so only in the context of its argument that the defendant's alleged violation of the injunction also violated CUTPA. The plaintiff has provided neither citation to legal authority regarding its right of quiet enjoyment claim nor analysis thereof. As such, we decline to consider the propriety of the court's judgment as to that claim, as it is inadequately briefed. See *Stubbs* v. *ICare Management, LLC*, 198 Conn. App. 511, 529, 233 A.3d 1170 (2020) ("[a]nalysis, rather than mere abstract assertion, is

the premises was compliant with all relevant laws and regulations at signing.[14] Specifically, the plaintiff contends that the court's determination is improper for two reasons: (1) the court's finding that an implied emergency access license agreement existed between Kirk's and the plaintiff that rendered the premises compliant with all relevant laws and regulations pursuant to § 10 of the lease is clearly erroneous; and (2) the defendant was required under the lease to provide the plaintiff with an egress "sufficient to obtain a liquor license and run a place of assembly . . . ." We disagree.

We begin with our standard of review. "The trier of fact's determination of a question of fact will not be overturned unless it is clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Under the clearly erroneous standard of review, a finding of fact must stand if, on the basis of the evidence before the court and the reasonable inferences to be drawn from that evidence, a trier of fact reasonably could have found as it did. . . . In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached. . . . Instead, we make every reasonable presumption . . . in

required in order to avoid abandoning an issue by failure to brief the issue properly" (internal quotation marks omitted)).

[14] We note that it is unclear exactly what laws and/or regulations the plaintiff claims the premises was not in compliance with at the start of the lease. The court found that that the egress onto Kirk's parking lot was required by both the fire marshal and the liquor commission. In its brief, the plaintiff argues that § 100.6.2.1 of the Connecticut Building Code requires the premises to have two means of egress if it is to be used as an assembly. Beyond that, the plaintiff never clarified what, if any, additional laws or regulations the premises was in violation of at signing. As such, we limit our review to the court's determinations, specifically, whether there existed a month-to-month license agreement between Kirk's and the plaintiff for use of the emergency exit and whether the defendant was required to provide an agreement between Kirk's and the plaintiff under the express terms of the lease.

favor of the trial court's ruling." (Citation omitted; internal quotation marks omitted.) *Giglio* v. *Ardohain*, 233 Conn. App. 743, 752, 341 A.3d 272 (2025). Furthermore, "[a]s a reviewing court [w]e must defer to the trier of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observations of their conduct, demeanor and attitude. . . . The weight to be given to the evidence and to the credibility of the witnesses is solely within the determination of the trier of fact." (Internal quotation marks omitted.) *Burr* v. *Grossman Chevrolet-Nissan, Inc.*, 224 Conn. App. 668, 681, 315 A.3d 414 (2024).

"[T]he standard of review for a lease, which is a contract, is plenary. Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law. . . . It is a general rule that a contract is to be interpreted according to the intent expressed in its language and not by an intent the court may believe existed in the minds of the parties. . . . When the intention conveyed by the terms of an agreement is clear and unambiguous, there is no room for construction. . . . [A] court cannot import into [an] agreement a different provision nor can the construction of the agreement be changed to vary the express limitations of its terms." (Citation omitted; internal quotation marks omitted.) *Pack 2000, Inc.* v. *Cushman*, 198 Conn. App. 428, 437–38, 234 A.3d 49, cert. denied, 335 Conn. 965, 240 A.3d 283 (2020).

"The elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages." (Internal quotation marks omitted.) *Ready* v. *New Canaan*, 232 Conn. App. 487, 495, 336 A.3d 1252 (2025). We note that the existence of a contract, including an implied in fact contract, is a question of fact. See *Connecticut Light & Power Co.* v. *Proctor*, 324 Conn. 245, 258, 152 A.3d 470 (2016) ("the existence of an implied

in fact contract is a question of fact for the trier"). "A manifestation of mutual assent may be made even though neither offer nor acceptance can be identified and even though the moment of formation cannot be determined. . . . Parties are bound to the terms of a contract even though it is not signed if their assent is otherwise indicated. . . . In addition, [w]hat the parties intended to encompass in their contractual commitments is a question of the intention of the parties, and an inference of fact." (Citations omitted; internal quotation marks omitted.) *Original Grasso Construction Co.* v. *Shepherd*, 70 Conn. App. 404, 411, 799 A.2d 1083, cert. denied, 261 Conn. 932, 806 A.2d 1065 (2002).

## A

The plaintiff first argues that the court's findings regarding the existence of an implied emergency access license agreement between Kirk's and the plaintiff and that such agreement rendered the premises compliant with all relevant laws and regulations pursuant to § 10 of the lease are clearly erroneous. We disagree.

The lease provides that the defendant "covenants with the [plaintiff] that the [premises] is in compliance with all governmental laws, regulations, and ordinances; and thereafter [the plaintiff] shall, at its own cost and expense . . . comply with all governmental laws, ordinances, orders and regulations affecting the [premises] . . . ." The original license agreement between Karaoke Heroes, LLC, and Kirk's provided for emergency access and rendered the premises compliant with relevant laws and regulations to operate as a karaoke bar. Lebov testified that, as manager of Karaoke Heroes, LLC, he paid Kirk's a monthly fee for this license agreement. Lebov further testified that, as owner and operator of the plaintiff, he continued to make monthly payments to Kirk's for "parking." Lebov, however, testified that he was never made aware of the license agreement between Karaoke Heroes, LLC, and Kirk's when he managed the day-to-day operations of Karaoke Heroes, LLC. He also said he was not aware that the plaintiff needed a license

agreement with Kirk's for an emergency exit egress to continue operating as a karaoke bar. The court specifically discredited Lebov's testimony that he was both unaware of the license agreement and that he was unaware of the need for the license agreement to run his karaoke bar.

Richard and Ronald both testified that the premises complied with all applicable laws and regulations at the time the parties entered into the lease. When Kirk's became aware that no written license agreement existed between the plaintiff and Kirk's, it drafted a new agreement to ensure that the plaintiff continued to have an egress in compliance with the fire department's requirements. To that end, the court determined that the license agreement between the plaintiff's predecessor and Kirk's continued on a month-to-month basis between the plaintiff and Kirk's due to Lebov's continued payment and Kirk's continued acceptance of the monthly license fee. Specifically, the court found that this agreement "existed as a result of the parties' conduct in the surrounding circumstances . . . and the plaintiff's delivery and Kirk's acceptance of monthly checks." As such, the court concluded, and we agree, that an implied agreement existed between Kirk's and the plaintiff. See *Connecticut Light & Power Co.* v. *Proctor*, supra, 324 Conn. 258; *Original Grasso Construction Co.* v. *Shepherd*, supra, 70 Conn. App. 411. The court therefore determined that the premises was compliant with all relevant laws and regulations at signing, as required by the defendant's covenant in § 10 of the lease.[15] On the basis of our careful review of

[15] In other words, the plaintiff began conducting its business with access to the emergency egress. During this time, it paid Kirk's a monthly fee for "parking," which gave it access to the parking space with bollards on it for an emergency exit egress. On July 6, 2018, the plaintiff signed the operative lease with the defendant, while retaining access to the parking lot through the continued payments to Kirk's for "parking." This arrangement continued well after the commencement of that lease, at which point the plaintiff assumed responsibility to comply with all relevant laws and regulations pursuant to § 10 of the lease. Only after Kirk's learned that there was no formal, written license agreement between itself and the plaintiff did it decide either to reinstate a formal, written license agreement or to terminate the plaintiff's then existing license. As the court noted, "Kirk's had the right to terminate

the record, we cannot conclude that the court's findings regarding the license agreement and the premises' compliance with applicable laws and regulations at signing are clearly erroneous.

B

The plaintiff next argues that the defendant was required to provide the plaintiff with an egress agreement with Kirk's under the lease and its failure to do so constituted a breach of § 10 of the lease. We disagree.

The lease does not explicitly require the defendant to provide an egress agreement for the plaintiff. The only ingress and egress explicitly mentioned in the lease is the entrance accessed through the alley entryway, not the emergency exit through the parking lot.[16] The lease, likewise, explicitly required the plaintiff to be responsible to ensure that the premises was compliant with all applicable laws and regulations after signing.

Although, as the plaintiff argues, tenants have a right of ingress and egress in rented premises, that does not mean that a tenant has a right to specific ingress and egress, as the plaintiff claims.[17] It is clear that the

the plaintiff's license [for] egress into the parking lot, which was being paid for on a month-to-month basis."

[16] The plaintiff seems to conflate the alley entryway, as described by the lease, and the emergency exit door accessed through the parking lot. Richard's testimony at trial, however, clearly notes that there are at least two entryways to the premises, an alley entryway and the emergency exit door.

[17] The plaintiff cites *Martel* v. *Malone*, 138 Conn. 385, 85 A.2d 246 (1951), for the proposition that a landlord is required to provide ingress and egress to rented premises and, on the basis of that requirement, argues that the defendant in this case was required to broker an agreement with Kirk's for the plaintiff for the emergency exit egress. In *Martel*, however, our Supreme Court stated that the "only means of access or egress"; id., 389; to a second floor apartment must be included in the implied terms of lease as it would be irrational to "say that the [tenant's] section of the building was rented to him but that the steps leading from it were not . . . ." (Internal quotation marks omitted.) Id., 390. We do not read *Martel* to require the defendant, in this case, to broker an emergency access agreement on behalf of the plaintiff with a nonparty.

plaintiff's means of ingress and egress was through the alley entryway. Moreover, we are aware of no authority, nor has the plaintiff provided any, in which a landlord was required to broker agreements with nonparties to ensure that the tenant had an additional means of egress through a nonparty's property throughout the duration of the tenant's lease. We are further mindful that, when reading the lease, we "cannot import into [it] a different provision . . . ." (Internal quotation marks omitted.) *Pack 2000, Inc.* v. *Cushman*, supra, 198 Conn. App. 438. As a result, the defendant's failure to broker such an agreement did not constitute a violation of § 10 of the lease. Accordingly, we conclude that the court properly determined that the defendant did not breach § 10 of the lease.

## II

The plaintiff claims that the defendant violated CUTPA when Kirk's removed the bollards from the parking space in violation of an injunction.[18] We disagree.

"In determining whether a tenant can prevail in her claim for damages under CUTPA, the court must first

[18] The plaintiff seems to argue that the defendant should be held in civil contempt for Kirk's violation of the court's injunctive order. Because the plaintiff did not claim civil contempt before the trial court, did not move for contempt with the court that issued the injunction, and mentions contempt for the first time on appeal, we decline to address this claim. "It is well established that an appellate court is under no obligation to consider a claim that is not distinctly raised at the trial level. . . . The requirement that [a] claim be raised distinctly means that it must be so stated as to bring to the attention of the court the precise matter on which its decision is being asked. . . . The reason for the rule is obvious: to permit a party to raise a claim on appeal that has not been raised at trial—after it is too late for the trial court or the opposing party to address the claim—would encourage trial by ambuscade, which is unfair to both the trial court and the opposing party." (Emphasis omitted; internal quotation marks omitted.) *Martin* v. *Todd Arthurs Co.*, 225 Conn. App. 844, 854–55, 317 A.3d 98 (2024).

The plaintiff also argues that the defendant violated its landlord responsibilities as found in the General Statutes. The plaintiff did not raise any specific violations of the General Statutes at trial, other than the emergency exit egress as discussed in part I of this opinion. The plaintiff, likewise, failed to identify which statutes the defendant allegedly

find that the landlord's conduct at issue constitutes an unfair or deceptive trade practice. . . . It is well settled that whether a defendant's acts constitute . . . deceptive or unfair trade practices under CUTPA, is a question of fact for the trier, to which, on appellate review, we accord our customary deference. . . .

"[General Statutes §] 42-110b (a) provides that [n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the [F]ederal [T]rade [C]ommission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some [common-law], statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]. . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. . . . Thus a violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy. . . . In order to enforce this prohibition, CUTPA provides a private cause of action to [a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a [prohibited] method, act or practice . . . ." (Citations omitted; internal quotation marks omitted.) *Freidburg* v. *Kurtz*, 210 Conn. App. 420, 432–33, 270 A.3d 135 (2022). "To the extent that [an appellant] is challenging the trial court's interpretation of CUTPA, our review is plenary. . . . [W]e review the trial court's

violated in its principal brief to this court. We decline to address this additional claim as it has been raised for the first time on appeal. See id.

factual findings under a clearly erroneous standard." (Internal quotation marks omitted.) *National Waste Associates, LLC* v. *Scharf*, 183 Conn. App. 734, 751, 194 A.3d 1 (2018).

The court expressly found that "the defendant did not engage in wrongful conduct with respect to the plaintiff's tenancy . . . ." As such, the court determined that the plaintiff failed "to demonstrate that the defendant's conduct offends public policy, is immoral, unethical, oppressive or unscrupulous, or caused substantial injury to consumers. As a result, the plaintiff's CUTPA claim fails." We are not persuaded that the court's finding was clearly erroneous. Further, the plaintiff has not established that *the defendant* engaged in any unfair, illegal, wrongful, immoral, or injurious behavior against the plaintiff. Arguably, at most, Kirk's, a nonparty, violated the injunction and thus engaged in the complained of conduct, not the defendant. Accordingly, we conclude that the court properly determined that the defendant did not engage in any behavior that would constitute a CUTPA violation.[19]

The judgment is affirmed.

In this opinion the other judges concurred.

[19]We reiterate that the plaintiff commenced this action against only the defendant. The injunction does not name Kirk's or any of the entities that own or operate the parking lot. Although there is a similarity of ownership, on one level, between Kirk's and the defendant, the defendant is not directly connected to Kirk's or the parking lot, only the defendant's owners are connected to the parking lot. As discussed, the defendant is owned by the LoRicco siblings in equal shares. 210 Crown Street, LLC, which owns the parking lot, is owned by MRVR, LLC (51 percent), and McLaughlin (49 percent). Kirk's is likewise owned by MRVR, LLC (51 percent), and McLaughlin (49 percent). MRVR, LLC, is owned by the LoRicco siblings in equal shares. Thus, the defendant is an entirely distinct entity from the owner of the company that owns the parking lot, MRVR, LLC, the owner of the parking lot, 210 Crown Street, LLC, and the operator of the parking lot, Kirk's. Moreover, McLaughlin operates Kirk's day-to-day business, not MRVR, LLC, or the LoRicco siblings.

Although the plaintiff recognizes that "Kirk's is the offending party," it argues that the court's determination "fails to consider who actually controls the majority interest of Kirk's and what they were personally

restrained from doing." We are perplexed by the plaintiff's argument, as the plaintiff has not argued or pleaded that the various nonparty limited liability companies, notably Kirk's, are mere shells or alter egos of either the defendant or the individuals who own and operate them. Specifically, the plaintiff failed to plead or introduce facts necessary to pierce the defendant's corporate veil through either the instrumentality test or the identity test. See, e.g., *Morris* v. *Cee Dee, LLC*, 90 Conn. App. 403, 414–15, 877 A.2d 899 (defining two rules to set aside protection of corporate form for limited liability companies), cert. granted in part, 275 Conn. 929, 883 A.2d 1245 (2005) (appeal withdrawn March 13, 2006). As such, even if we were to conclude that Kirk's had violated the injunction, we fail to see how that would entitle the plaintiff to any practical relief against the *defendant* in the present case.